(17 App. Div. 257.)

ROCHESTER & H. V. R. CO. v. CITY OF ROCHESTER.

(Supreme Court, Appellate Division, Third Department, May 5, 1897.)

1. RAILROADS—OPENING STREET ACROSS TRACK—COMPENSATION.
   Laws 1853, c. 62, §§ 1, 2, providing that a street may be laid out across "the track" of any railroad without compensation to the railroad company, and that it shall carry the street across its "track," and construct all necessary approaches, apply only to such tracks as are used for public travel and carriage, and not to tracks used for the storage of cars, approaches to repair shops and engine houses, or other terminal purposes.

2. COSTS—EXTRA ALLOWANCE—AMOUNT IN CONTROVERSY.
   The amount in controversy, in an action by a railroad company to enjoin a city from proceeding to compel plaintiff at its own expense to carry a street across its tracks, is the amount of such expense.

3. SAME—INCIDENTAL DAMAGES.
   In such case damages likely to be occasioned to the approaches to plaintiff's coal pockets by carrying the street across the tracks by an overhead crossing are too speculative and incidental to be considered as an item of the amount in controversy, where an overhead crossing is not necessarily involved.

Appeal from special term, Monroe county.

Action by the Rochester & Honeoye Valley Railroad Company against the city of Rochester. From a judgment restraining defendant from opening a street across certain premises of plaintiff, and from an order granting plaintiff an extra allowance, defendant appeals. Judgment affirmed. Order modified.

The plaintiff was duly organized in January, 1888, for the purpose of constructing and operating a railroad from a point on an "island," so called, between the Erie Canal and feeder, on the east, and the Genesee river, on the west, in the city of Rochester, southerly to the village of Honeoye Falls. On the 27th February, 1890, the plaintiff filed a map and certificate of location of part of its route, in and by which it proposed to take for the location of its railroad and terminal facilities so much of the island as is south of the state lands thereon. In order to acquire title to this property, the plaintiff on the 19th March, 1890, instituted a proceeding under the condemnation law, covering all sought to be acquired, except a portion owned by one Ellison. It was alleged in the petition that the property was required by the plaintiff for the purpose of constructing and operating its railroad, and for the necessary stations, depots, switches, and other terminal facilities required for its business. The petition, with proof of due service on all parties whose lands were sought to be acquired, was filed on the 2d April, 1890, and orders were made appointing commissioners of appraisal. Reports were made by the commissioners, and on the 16th January, 1891, the final order of confirmation was entered and recorded. On or before the 13th February, 1891, the plaintiff paid the awards to the respective parties, and entered upon the possession of the premises. The portion of the island owned by Ellison was conveyed to plaintiff on the 10th June, 1890. The land so acquired by the plaintiff, and known as the "island," is 175 feet wide at its northerly end, 30 feet wide at its southerly end, and 480 feet wide at the widest part between the eastern boundary and the river bank. Its average width is about 350 feet, and its length, measured along the center line of the plaintiff's railroad, is 2,808 feet. Its area is 21 acres. It is found by the referee that "the said land known as the 'island' was acquired by the plaintiff for roadway, depots, buildings, freight ground, and other necessary terminal facilities for the use and operation of its said railroad and the transaction of the business to be done thereon, and the same is necessary therefor, in view of the probable increase of such business." The defendant proposes to lay out and open a highway, 50 feet in width, to connect West Alexander street, on the east side of the Genesee river, with Edinburgh street, on the west side. This highway, if laid out as proposed, will cross the island,

and the tracks of the plaintiff laid or to be laid thereon, and also a portion of the land deeded by Ellison to the plaintiff, lying between the west shore of the island and the center line of the river. On the 27th January, 1891, the common council of the defendant adopted resolutions, known as "first ordinances," for the opening of such street, and the proceeding thus commenced resulted in the making of a report by commissioners appointed to condemn land for such street. This report was confirmed November 17, 1891. No notice of this proceeding, or of any step taken therein, was served upon the plaintiff; and the plaintiff was not a party to the proceeding, and did not appear therein, and no award was made to it. The assessment for the payment of the awards has not been made. Prior to the adoption of the ordinances above referred to, the common council of ·defendant had passed several other like ordinances for the opening of such street, the first of which was dated the 20th January, 1888; but no notice was given to plaintiff of either of them, and the plaintiff was not a party to either, and did not appear therein, and neither was prosecuted to the point of adopting resolutions to condemn land. The defendant and its common council propose and threaten to open said street across plaintiff's property without compensation to plaintiff, claiming that, under and by virtue of the provisions of chapter 62 of the Laws of 1853, the plaintiff is bound to carry said street or highway across its lands at its own expense; and the defendant proposes and threatens to serve plaintiff with the notice specified in the statute, and to hold plaintiff responsible for the penalties therein provided in case of its refusal to comply with the demands of the defendant, and to compel plaintiff to carry the street across its lands. The referee finds that the proposed street, if laid at grade, "would not only cross the two main tracks of plaintiff's road, used for ordinary transit, but also other tracks, designed for switching and storing cars and making up trains; would interfere with tracks leading to the coal pockets and other structures, and with the use of a part of the yard room. If carried overhead, it would render necessary material and expensive alterations in the construction of the approaches to the plaintiff's coal pockets; its supports would obstruct portions of the plaintiff's track room; and if, as proposed by defendant, it should give a clearance of only 17 feet above plaintiff's tracks, it would increase the inconvenience and danger of operating the plaintiff's freight cars." The referee, as matter of law, decided that the defendant has not the right to lay out the proposed street across the land and tracks of the plaintiff without compensation, and that it is not the duty of the plaintiff to cause the proposed street to be taken across its land and premises, or to cause embankments, excavations, or other work to be done on its road for that purpose. An injunction was ordered as prayed for in the complaint.

Argued before PARKER, P. J., and LANDON, HERRICK, PUTNAM, and MERWIN, JJ.

A. J. Rodenbeck, for appellant.
Saterlee, Yeoman & Taylor, for respondent.

MERWIN, J. At the time of the commencement of this action, in January, 1892, there had been no tracks or buildings constructed by the plaintiff on the island. Prior to October, 1892, four tracks had been laid; the plaintiff having commenced to operate its road on September 1, 1892. At the time of the trial, nine tracks had been laid, and others were in contemplation. A large amount of evidence was given at the trial upon the subject of the necessity of the use by the plaintiff of the whole of its terminal property. The finding of the referee on that subject is fully sustained by the evidence. Clearly, such a case was presented as rendered it probable that these lands would be required, within a reasonable period, for the use of the corporation. In re Staten Island Rapid-Transit Co., 103 N. Y. 251, 257, 8 N. E. 548. Besides, the proceeding for condemnation instituted by the plaintiff was a proceeding in rem (In re Union El.

R. Co., 112 N. Y. 61, 74, 19 N. E. 664), and the adjudication in such a case cannot ordinarily be questioned in a collateral proceeding. The defendant in its answer admits that the plaintiff, by virtue of the right of eminent domain for public use under the provisions of the general railroad laws of the state, has acquired such rights as are provided by the statute in the island property. The plaintiff, under its condemnation proceedings, was in possession before the defendant took any proceedings to condemn the land for highway purposes. It is hardly claimed that the defendant has any prior right in this regard to the plaintiff. It seeks, under the ordinance of January 27, 1891, to compel the plaintiff to carry the street across the island, and relies on the act of 1853. That relates only to the construction of roads and streets across railroad tracks. The defendant, therefore, is in the attitude of attempting to lay out and open a street across property already condemned for a public purpose. The street, as proposed, is entirely on such property, except a portion of the Ellison property, lying between the west shore of the island and the center of the river. The entire distance of the street across the island is within the property condemned. The defendant, in this view, is met with the proposition that lands once taken for a public use, pursuant to law, under the right of eminent domain, cannot, under general laws, and without special authority from the legislature, be appropriated, by proceedings in invitum, to a different public use. Railroad Co. v. Williamson, 91 N. Y. 552. The question then comes whether the act of 1853 is sufficient special authority to sustain the defendant in its position that the plaintiff should carry the street across the island. Sections 1 and 2 of the act of 1853 are as follows:

"Section 1. It shall be lawful for the authorities of any city, village or town in this state, who are by law empowered to lay out streets and highways, to lay out any street or highway across the track of any railroad now laid or which may hereafter be laid, without compensation to the corporation owning such railroad; but no such street or highway shall be actually opened for use until thirty days after notice of such laying out has been served personally upon the president, vice-president, treasurer or a director of such corporation.
"Sec. 2. It shall be the duty of any railroad corporation, across whose track a street or highway shall be laid out as aforesaid, immediately after the service of said notice, to cause the said street or highway to be taken across their track, as shall be most convenient and useful for public travel, and to cause all necessary embankments, excavation and other work to be done on their road for that purpose; and all the provisions of the act, passed April second, eighteen hundred and fifty, in relation to crossing streets and highways, already laid out, by railroads, and in relation to cattleguards and other securities and facilities for crossing such roads shall apply to streets and highways hereafter laid out."

The third section provides for penalties for neglect or refusal on the part of the corporation to perform as the act provides.

The proposed street is 50 feet wide, and its distance across the island is 278 feet. The claim of the defendant is, in effect, that the whole distance across the island is the "track" of the plaintiff, within the meaning of the statute. The defendant has no other authority to open its road over any part of the route across the island, and therefore, unless the whole distance is the track of the plaintiff, its position is not sustained. It cannot compel the plaintiff to carry the street across a part, in the absence of any right on the part of the

45 N.Y.S.—44

defendant to open the street as to the balance. The act of 1853 has been construed in several cases. In Railroad Co. v. Brownell, 24 N. Y. 345, the plaintiff had acquired title to an irregular piece of land at one of its stations on which to lay its track, and also for the accommodation of a station house, and for a side track connected with the main track by turnouts and switches, and for a turntable or Y, and for other conveniences of the road. The highway, as laid out, passed over the track and the side track, and also occupied a portion of the plaintiff's ground suitable for the site of an engine house, and on which such a building was afterwards erected, occupying the entire width of the highway, and connected with the turntable by another side track. The court, in affirming the judgment which enjoined the defendants from laying out the highway across the plaintiff's premises, say that the act of 1853 authorized the town authorities to lay out the highway across the main track and the side track connected therewith, but not across the grounds which the company had acquired as sites of its station house, engine house, turntable, etc., no provision being made for compensation; that:

"The act of 1853 does not, in language, or by any necessary implication, extend to an appropriation of such land to the purposes of a highway, and it does not fall within the policy which contemplated that the track of the railroad might be so used. The use of the land acquired by the railroad company for its track was such as admitted of a concurrent use for the purposes of a highway, but it was quite otherwise with that which was obtained for the engine house and other structures. As to this, the uses to which it was to be subjected were the same as those which any proprietor of land may be supposed to have for premises purchased by him for building purposes. To run a highway through such grounds is to appropriate the portion covered by it exclusively for a public use. Moreover, such land falls within the denomination of improved land, through which a highway cannot be laid out without an obligation to make compensation."

In Boston & A. R. Co. v. Village of Greenbush, 52 N. Y. 510, it was held that the act of 1853 has reference only to tracks used for public traffic, and for turnouts and switches, and does not include grounds upon which tracks are laid for storing cars or exclusively for making up trains. Church, C. J., says:

"The track specified in the act may include one or more single tracks, but should, I think, be limited to the track used for public traffic, whether composed of one or more, including turnouts and switches, or, in other words, what may fairly be regarded as the roadway. Grounds upon which tracks are laid for storing cars, or exclusively for making up trains, are not embraced in the term 'track.' The finding of fact is that the seven tracks proposed to be crossed are in 'constant use for passing trains, and for switching off cars and making up trains.' This finding does not relieve the premises from the operation of the statute. We cannot infer that these grounds were used substantially for storing cars. On the contrary, the import of the finding is that, although in constant use for passing trains, the tracks were also used for switching off cars and making up trains. This might be done at any point on the road where there is a turnout or switch." An injunction was denied.

In Delaware & H. Canal Co. v. Village of Whitehall, 90 N. Y. 21, the land of the plaintiff embraced within the proposed street crossing was five rods in width; was covered by four railroad tracks, two of which were the main tracks of the railroad for the passing of cars, and two were extra tracks extending several hundred feet both to the north and south of the proposed street crossing, and were used,

in connection with others, for switching cars, making up trains, and for allowing cars to stand upon until they could be put into trains about to depart. An injunction was denied, it being said by Danforth, J., that the "track" referred to in the act of 1853—

"Signifies the entire roadbed, and not merely the iron or railway. If, therefore, there are within its limits, and between the lines of any proposed street or highway, switches or points or other contrivances for passing engines or cars from one line of rails to another, it could not prevent the laying out of a street or road under the act in question. * * * The land with which interference is threatened is part of the roadbed or track, is neither depot grounds nor improved property, except for track or public traffic purpose, and is within the letter of the statute. * * * So far from being ground upon which tracks are laid for storing cars, it is part of the roadway taken for public travel and carriage, and the tracks are evidently mere turnouts or switches furnishing passage, but where trains may also be made up, and cars transferred. They are appropriately termed by the trial court 'extra tracks.' But they are laid on land acquired by the corporation for the purpose of locating the track, and for this purpose solely; and, although it may prevent facilities for approaching water tanks and engine houses, the street will cross no ground acquired for such purposes, and it may, we think, be laid out without compensation to the plaintiff."

In Railroad Co. v. Williamson, supra, it was held that the act of 1853 did not apply to lands taken for depot purposes. In that case the plaintiff's railroad was an excursion road, and the proposed highway passed through terminal grounds, between the depot building and the sea beach, about 700 feet in length, occupied in part by railroad tracks running to high-water mark, plank walks for passengers, and by various structures for their accommodation, convenience, and pleasure.

In the present case the route of the proposed street across the island is about 950 feet from its southerly end. All of the buildings constructed, or proposed to be constructed, are north of it. The ground south of the street was designed to be used for making up trains and storing cars. At the time of the trial there had been built, or were in process of construction, north of the street, a train shed and depot, a freight house, an engine house, and a coal trestle and pockets. Other terminal structures were in contemplation. The coal pockets, as erected, are 30 feet above the rail of the track, and the approach to the coal trestle from the south at the point where it crosses the proposed street is about 15 feet above the grade line of the railroad. Another coal trestle, with accompanying pockets, is in contemplation easterly of the one already erected, and the elevation of its approach across the proposed street will be about the same as the other. At the easterly end of the proposed street, for the distance of about 100 feet, there will be no other tracks, except these approaches to the coal pockets. At the westerly end of the proposed street, for the distance of about 100 feet, no tracks had been laid at the time of the trial. It appears to be the design of the plaintiff to erect repair shops a short distance northerly of this space, and the tracks extending to these shops, or to be used in connection with them, to the number of seven, would extend southerly across the proposed street. This is said to be the "cripple yard." The remaining or central portion of the proposed street is crossed by the two main tracks of the plaintiff, and by four or five other tracks, as indicated by the

map,—one leading to the engine house, others to the freight houses. There is evidence that these are designed to be used for the general purposes of a yard, shifting cars, storing both empty and loaded cars, and also for the operation of the road. From this general description of the situation, it is quite apparent that, for at least two-thirds of the way across the island at the locality of the proposed street, there was no such occupancy, in fact, existing or intended, as could fairly be brought within the meaning of the expression "the track," as used in the statute and construed by the courts. The road-bed or the roadway was not located on the 100 feet at either end of the proposed street. The tracks at those localities were not for public travel and carriage. The tracks in the cripple yard were to be for storing cars, or for use in repairing them. The coal pockets and approaches were structures necessary in the storage and delivery of freight. It was claimed at the trial that the approaches to the coal pockets could be from the north, and so would not be interfered with by the proposed street. If that change was made, then in that part of the proposed street there would be no track over which the city could compel the plaintiff to carry the highway, and the defendant could not take that part of the property without compensation, even if the fact of condemnation was not considered. In a certain sense, the whole property of the plaintiff on the island constituted its terminal depot grounds. The question is not whether any permanent structure of the plaintiff will be interfered with, but whether the defendant cannot only take the plaintiff's property without compensation, but also compel it, at its own expense, to carry the street across the entire island. The foregoing considerations lead to the conclusion that the defendant has not the right to compel the plaintiff to carry the proposed street across the island, and therefore the judgment appealed from is correct.

The appeal from the order granting an extra allowance of costs presents the question whether there is any sufficient basis for the order. The defendant claims that the subject-matter in controversy cannot be reduced to a moneyed value. The controversy is over the right of the defendant to compel the plaintiff to carry the highway across the island. The amount of the expense of such work was directly involved. The right to charge it upon the plaintiff was the subject litigated. The amount of the expense was the subject-matter involved. Code. Civ. Proc. § 3253; Hudson River Tel. Co. v. Watervliet Turnpike & Railroad Co., 135 N. Y. 394, 32 N. E. 148; Empire City Subway Co. v. Broadway & S. A. R. Co., 87 Hun, 279, 33 N. Y. Supp. 1055. The amount allowed was $1,000, which seems to be upon the theory that the expense of an overhead crossing could be considered. That was not necessarily involved. The plaintiff claims that the damage likely to be occasioned to the approaches to the coal pockets could be considered. That, however, was somewhat speculative and incidental, and, within the principle laid down in Conaughty v. Bank, 92 N. Y. 401, 404, should not be considered. The expense of a crossing at grade was a proper basis. The evidence in the case was made a part of the moving papers. In that there is evidence tending to show that the expense of a suitable crossing at grade would

be from $5,000 to $7,000. The affidavits in opposition put it at a less figure. The extra allowance should be reduced to the sum of $250.

Judgment affirmed, with costs. · Order granting an extra allowance modified by reducing the amount allowed to the sum of $250, and, as modified, affirmed, without costs of appeal to either party. All concur.