## CHICAGO, R. I. & P. R. CO. v. TAYLOR.

No. 11102—Opinion Filed June 29, 1920.

Rehearing Denied Sept. 7, 1920.

(Syllabus by the Court.)

1. **Railroads — F r a n c h i s e — Legislative Source.**

The right to construct, maintain and operate a railroad and receive toll or fare for the

transportation of freight and passengers is a franchise which can be exercised only by legislative authority.

**2. Same—Status as Public Service Corporations—State Regulation.**

While not open to general use like streets and roads, railroads are public highways; they are quasi· public institutions; the devotion of their property to the public use affects it with a public interest; and while they are protected by constitutional limitations, they are peculiarly subject to be regulated by the state.

**3. Same—Duty to Maintain Safe Crossings Over Highways.**

The obligation to construct and maintain safe crossings over streets and highways laid out before the construction of a railroad is imposed upon the railroad by the common law.

**4. Same—Requirements Under Common Law.**

Under the common law it was the duty of a railroad company when it crossed a highway to do all those things necessary to restore the highway, including the construction of bridges, approaches, or lateral embankments, rendered necessary by the construction of the railroad tracks or grades over or through the highway. This duty is based upon the equitable principle that, inasmuch as the railroad rendered this work necessary, it was therefore just and right that the railroad should bear the expense and burden of restoration.

**5. Same—Powers of Legislature—Police Power.**

The Legislature in the exercise of the police powers may onerate railroad companies with the duty of maintaining highway crossings, although the street or highway was laid out across the railroad subsequent to the construction of the railroad.

**6. Constitutional Law—Police Power of State.**

While no court has undertaken to specifically define the outlying boundary lines of that inherent power of the government to enact, within constitutional limitations, laws to promote the order, safety, health, morals, and general welfare of society, denominated, for want of a better name, the police power, of the state, it is firmly settled that such power is an attribute of sovereignty and exists without reservations in the Constitution.

**7. Railroads—Regulation—Police Power—Abolition of Grade Crossings.**

In the exercise of its police power, the state may require railroad corporations at their own expense not only to abolish grade crossings, but to build and maintain suitable bridges or viaducts to carry the street or highway across the railroad tracks and entire right of way.

**8. Same — Constitutional Law — Grant by Congress to Road in Indian Territory—State Regulation—Franchises.**

Section 2 of the act of Congress of March 2, 1887 (24 St. L. 446), granted to the railroad company "a right of way one hundred feet in width through said Indian Territory, and to take and use a strip of land two hundred feet in width, with a length of three thousand feet, in addition to right of way, for stations." Section 9 of said act requires that "said railroad company shall construct and maintain continually all road and highway crossings and necessary bridges over said railway wherever said roads and highways do now or may hereafter cross said railway's right of way, or may be by the proper authorities laid out across the same." Held: (1) That there is no provision in said act expressly exempting the railroad company, or its successors, from the duty to construct and maintain streets and highways across its entire right of way; (2) that franchises and rights of way granted by the public are to be construed strictly against the grantee and liberally in favor of the public; (3) that the act of the Oklahoma Legislature effective August 24, 1908, requiring railroads to build crossings and maintain the highway unobstructed over its entire right of way, is not in conflict with section 10, article 1, of the federal Constitution, prohibiting the states from impairing the obligations of contracts; (4) that said act of the Oklahoma Legislature in defining the duties of the railroad company with respect to highway crossings did not operate to take the property of the railroad for public purposes without just compensation, and is therefore not in conflict with the fifth amendment to the federal Constitution.

**9. Railroads — Crossings — Regulation — Police Power.**

A railroad crossing is within itself a continuing source and warning of danger, and laws requiring the railroad to construct and maintain the crossings, laws providing the method of constructing crossings, and laws designating the extent of the duties imposed upon the railroad company fall peculiarly within the police powers of the state, because their purpose is not only to guard the public traveling on the highways from harm and injury, but to protect the railroad company, its employes, passengers, and property from injury.

**10. Same.**

The cost to the railroad company of maintaining the highway or street unobstructed across its entire right of way is compensated for by the consequential reduction and prevention of loss, which otherwise an obstructed and unsafe highway crossing inflicts upon the railroad itself, and its authority to make the highway safe over its entire right of way without awaiting the tardy and un-

certain acts of city and township officers, puts the railroad company in a position where it can minimize accidents to the traveling public and its employes, as well as damage to its own property.

## 11. Constitutional Law—Police Power—Nature.

The police power of the state can neither be abrogated, bargained away, nor alienated, even by express grant, and all contracts and property rights are acquired subject to its fair exercise, and neither the contract clause nor the due process clause in the federal Constitution overrides the power of the state to establish necessary and reasonable regulations under its police powers.

## 12. Same—Contracts With Municipality—Validity.

As the police powers cannot be surrendered, a contract purporting to do so is void ab initio, and being void, it is impossible to speak of laws in conflict with its terms as impairing the obligations of a contract. But where the terms and obligations agreed upon between a state or municipality on the one hand, and a corporation or individual on the other, are the proper subject-matter of a contract between such parties, and not of that class discussed in L. & N. R. Co. v. Mottley, 219 U. S. 467, their contract, plainly specifying the duties of the parties, legally entered into, falls within the protection of the contract clause of the federal Constitution; and it is not within the police power of the state or municipality to impair the same, because states, municipalities, and other sub-divisions of the state are bound by the same high standard of good faith and morals required of individuals, and the breach of its legal contract by a city or state, instead of promoting the public safety, morals, and good order of society, is in fact unmoral and unsafe, because the vitality of the individual conscience will not long survive a benumbed and perverted public conscience. This court does not subscribe to the doctrine that might is right.

## 13. Same—Territories—Status of Police Power at Advent of Statehood.

Prior to the admission of Oklahoma as a state, the federal government held in trust the police power of the future state, and as trustee thereof had no authority to enter into any contract with a corporation or an individual exempting such individual or corporation from the exercise by the future state of all the sovereignty possessed and vested in one of the 13 original states.

## 14. Same—Powers of Federal Government—States.

While the federal government was vested with police powers in the Indian Territory, it had no authority under the federal Constitution to surrender or contract away the police power of the future state, and upon Oklahoma's admission as a state, the powers and sovereignty of the federal government were withdrawn, except those powers the fed-

eral government can rightfully exercise in any other state under similar circumstances.

## 15. Railroads—Crossings in Cities—Statutes.

Sections 611 and 1432, Rev. Laws 1910, construed together, mean this: It is the duty of a railroad company to construct and maintain unobstructed in a safe condition crossings over its entire right of way in such manner as it, at its own risk, shall adjudge to be proper, the city having the authority, however, to require the railroad company to pave so much of said street as may be occupied by its tracks or track and two feet on each side, and when more than one track crosses such street within a distance of 100 feet, measuring from inside rail to inside rail, also to grade, gutter, drain, curb, pave, or improve between its tracks in the same manner as the city may be improving or has improved the other portion of said street.

## 16. Same—City Improvements at Crossings—Liability.

The city cannot require the railroad company to improve the crossing in a different manner from the balance of the street contiguous thereto, and when the city exercises its powers conferred by section 611, it takes over the duty and responsibility of maintaining that part of the crossing over the railroad right of way not covered by the paving and improvement required of the railroad company by that section.

## 17. Municipal Corporations—Unsafe Streets—Ditch at Railroad Crossing—Nuisance.

A city cannot legally maintain an open catch basin, or open and unguarded excavation for drainage purposes in a street on the railway company's right of way, with or without the consent of the railroad company. Such an open drain three to three and one-half feet deep, lying unguarded between the side walk and the main traveled portion of the street, is a nuisance.

## 18. Railroads—Unsafe Street Crossing—Duties.

It was the railroad company's duty to maintain unobstructed crossings over its entire right of way, and it was at fault in suffering the city to maintain an open excavation on its right of way and in close proximity to its railroad tracks, when it must have foreseen that travelers in horse drawn vehicles would probably be injured by it remaining open and unguarded.

## 19. Same—Personal Injuries to Travelers—Liability.

The railroad company, as well as the city, is liable where a horse takes fright, without any negligence on the part of the driver, at something for which the railroad or municipality is not responsible, and gets beyond the control of the driver and while beyond his control comes in contact with some obstruction or defect in the highway over the railroad company's right of way which the rail-

road company was negligent in not repairing or removing.

Error from District Court, Canadian County; James I. Phelps, Judge.

Action by Lucile Taylor against the Chicago, Rock Island & Pacific Railway Company for personal injuries. Judgment for plaintiff, and defendant brings error. Affirmed.

Defendant in error, plaintiff below, contends that about eight o'clock p. m. she, in company with her husband and small child, was traveling along Watt street in the city of El Reno, in an open buggy drawn by one horse; that Watt street crosses the defendant's right of way near its railroad station; that defendant has five railroad tracks across said Watt street and on its right of way. She bases her case on two grounds: (1) That as they approached said railroad crossing, an engine with two cars backed across the street, and as they got about even with the horse, which was in plain sight, the defendant's employes carelessly and negligently caused the engine to emit steam towards the horse, with a loud hissing noise, at which the horse became frightened and overturned the buggy and occupants into a hole or excavation on the railway right of way within the street. The gravamen of that part of the petition is that by carelessly and negligently emitting steam with a loud hissing noise, the defendant frightened the horse and caused him to overturn the buggy, with the plaintiff and other occupants, into an exacation, from which she suffered injuries. (2) That the railroad company was negligent and responsible to her in damages for the injury she sustained, because it permitted and suffered the exacavation within the said street on its right of way. The gravamen of this ground for recovery is that the horse became frightened and the proximate cause of the injury was the excavation on the railway company's right of way and within the said street, and that she is consequently entitled to recover damages, irrespective of whether or not the steam was negligently emitted. The defendant brings the case here to reverse a judgment for plaintiff, and assigns as error the action of the trial judge in charging the jury that it was the duty of the company to construct a crossing across its entire right of way on Watt street, and maintain the same in good condition, and that a failure to do so was negligence on its part, and that if the evidence disclosed that the company permitted the hole on its right of way in Watt street, and thereby violated its statutory duty, and the jury found the hole in the street on the right of way was the proximate cause, or one of the proximate causes, of the plaintiff's injury, plaintiff was entitled to recover if the jury found she was not guilty of contributory negligence. There was sufficient evidence to go to the jury on the issue as to whether or not steam was negligently emitted, and the only assignment of error seriously insisted upon is the judge's instruction to the jury that it was the duty of the railroad company to construct and maintain the street across its entire right of way.

Raymond A. Tolbert, C. O. Blake, W. R. Bleakmore, and R. S. Lewis, for plaintiff in error.

Ledbetter, Stuart, Bell & Ledbetter and A. G. Morrison, for defendant in error.

RAMSEY, J. (after stating the case above.) By the act of Congress approved March 2, 1887, the Chicago, Kansas & Nebraska Railway was granted a right of way through the Indian Territory (24 St. L. 446). Section 9 of said act provides "that said railroad company shall construct and maintain continually all road and highway crossings and necessary bridges over said railway wherever said roads and highways do now or may hereafter cross said railway's right of way, or may be by the proper authorities laid out across the same." Plaintiff in error, Chicago, Rock Island & Pacific Railway Company, by virtue of the act of Congress approved June 27, 1890, (26 St. L. 181), purchased and became the owner of the same, by conveyance, of all railway, property rights, and franchises of the Chicago, Kansas & Nebraska Railway Company in the territory of Oklahoma and in the Indian Territory, including all rights, privileges, and franchises granted to the latter company by the act of Congress of March 2, 1887. Oklahoma Territory and Indian Territory were organized as the state of Oklahoma under the Oklahoma and Indian Territory Enabling Act (34 St. L. 267), approved June 16, 1906, and admitted into the Union on November 16, 1907, "on an equal footing with the original states." The Oklahoma State Legislature, by act effective August 24, 1908, provided that:

"It shall be the duty of every railroad company or corporation doing business, or operating a line of railroad, within this state, to construct a crossing across that portion of its track, road-bed or right of way over which any public highway may run, and maintain the same unobstructed, in a good condition for the use of the public, and to build and maintain in good condition all bridges and culverts that may be necessary on its right of way at such crossing; and in case any railroad company or corporation fails so to construct and maintain said crossing for thirty days after written notice by the road overseer of any road district or the council or board of trustees of any city or town in this state or fifty petitioners of any city or town who are interested (where such

work or repairs are needed), to be given to the section boss, or any station agent of any railroad company or corporation in the county (where such work or repairs are needed), it shall forfeit and pay to said county, road district, city or town complaining, the sum of twenty-five dollars per day for every day said company or corporation may neglect to comply with the requirements of this section." Section 1432, Rev. Laws 1910.

Thus it will be seen that the state Legislature onerated railroads with the duty of not only constructing crossings over the highways across that portion of its tracks and roadbed or **right of way** over which the public highway passed, but to "maintain the same unobstructed, in a good condition for the use of the public, and to build and maintain in good condition all bridges and culverts that may be necessary on its right of way at such crossing."

1. The right to construct, maintain and operate a railroad and receive toll or fare for the transportation of freight and passengers is a franchise which can be exercised only by legislative authority. Blake v. Winona, etc., R. R. Co., 19 Minn. 418, 18 Am. Rep. 345; Central R. of N. J. Co. v. Pennsylvania R. Co., 31 N. J. Eq. 475; Talcott v. Pine Grove Tp., 23 Fed. Cases, No. 13,735. The grant of a franchise after performance by the grantee becomes a contract. Mitchell et al, v. Tulsa Light, Heat & Power Co., 21 Okla. 243, 95 Pac. 951; Louisville Gas Co. v. Citizens Gas Light Co., 115 U. S. 683, 29 L. Ed. 510; Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 43 L. Ed. 341; Enid City Railway Co. v. City of Enid, 43 Okla. 778, 144 Pac. 617. A franchise contract falls within the protection of section 10, article 1, of the federal Constitution, prohibiting states from impairing the obligations of a contract, and also within the protection of the fifth amendment to the federal Constitution, prohibiting the taking of private property for public use without just compensation. Plaintiff in error contends that under section 9 of the right of way act of Congress of March 2, 1887, the railway assumed no other burden with respect to highway crossings than the contractual obligation to "construct and maintain continually all road and highway crossings and necessary bridges over said railway wherever said roads and highways do now or may hereafter cross said railway's right of way, or may be by the proper authorities laid out across the same," and that therefore the act of the state Legislature effective August 24, 1908, above quoted, violates the federal Constitution in that it imposes upon the railway company the additional burden of maintaining the highway unobstructed and in good condition across the entire length of its right of way.

instead of across that part of its right of way upon which its railroads were located.

While not open to general use like streets and roads, railroads are public highways; they are quasi public institutions; the devotion of their property to the public use affects it with a public interest; and while they are protected by constitutional limitations, they are peculiarly subject to be regulated by the state. These principles have been too long established to require the citation of authority. Article 9, especially section 6 thereof, Williams' Oklahoma Constitution, is declaratory of these principles.

Whether the railroad preceded or succeeded the construction of Watt street in El Reno is not shown by the record, nor is it material. The obligation to construct and maintain safe crossings over streets and highways laid out before the construction of a railroad is imposed upon the railroad by the common law. King v. Kent, 13 East. 220; Boston & A. R. Co. v. City of Cambridge, 159 Mass. 284, 34 N. E. 382; Illinois Cent. R. Co. v. Copiah County, 81 Miss. 685, 33 South. 502; City of Bloomington v. Illinois Cent. R. Co., 154 Ill. 542, 39 N. E. 478; Cleveland v. Augusta, 102 Ga. 233, 29 S. E. 584, 43 L. R. A. 638; Eyler v. Allegheny County, 49 Md. 257, 33 Am. Rep. 249; People ex rel. Bloomington v. Chicago & A. R. Co., 67 Ill. 118; Dygert v. Schenck, 23 Wend. (N. Y.) 445, 35 Am. Dec. 575; Harriman v. Southern Ry. Co., 111 Tenn. 538, 82 S. W. 213; State v. St. Paul, M. & M. Ry. Co., 35 Minn. 131, 59 Am. Rep. 313. Under the common law, it was the duty of a railroad company when it crossed a highway to do all those things necessary to restore the highway, including the construction of bridges, approaches, or lateral embankments, rendered necessary by the construction of the railroad tracks or grades over or through the highway. This duty is based upon the equitable principle that inasmuch as the railroad renders this work necessary, it is therefore right and just for the railroad to bear the expense and burden of restoration and maintenance. While some authorities (Illinois Central R. Co. v. City of Bloomington, 76 Ill. 447; City of Bloomington v. Illinois Cent. R. Co. [Ill.] 39 N. E. 478) hold that the common law does not require a railroad company to maintain the highway laid out across its tracks after the construction of the railroad. it is firmly settled by the courts in a long line of decisions that the Legislature in the exercise of its police powers may onerate railroad companies with the duty of maintaining crossings, although the street or highway was laid out subsequent to the construction of the railroad. State v. St. Paul, M. & M. Ry. Co., 98 Minn. 380, 8 Am. & Eng. Ann. Cases, 1047; State v. St. Paul, M. & M. Ry. Co., 35 Minn.

131, 59 Am. Rep. 313; City of Milwaukee v. Chicago, M. & S. P. R. Co. (Wis.) 171 N. W. 54; State ex rel. St. Paul v. Minnesota Transfer Ry. Co. (Minn.) 50 L. R. R. 656; City of Superior v. Roemer (Wis.) 141 N. W. 250; New York & N. E. R. Co. v. Bristol, 151 U. S. 556; C., B. & Q. R. Co. v. Chicago, 166 U. S. 226, 252; C., B. & Q. R. Co. v. Nebraska, 170 U. S. 57; Northern Pacific Ry. Co. v. Duluth, 208 U. S. 583; C., I. & W. Ry. Co. v. Connersville, 218 U. S. 336; Chicago, M. & St. P. R. Co. v. Minneapolis, 232 U. S. 430. No court has undertaken to define specifically the outlying boundary lines of that inherent power of government to enact, within constitutional limitations, laws to promote the order, safety, health, morals, and general welfare of society, denominated, for want of a better name, the police power of the state. It has been said that "the police power is that inherent sovereignty which is the right and duty of the government or its agents to exercise whenever public policy, in a broad sense, demands, for the benefit of society at large, regulations to guard its morals, safety, health, order, or to insure in any respect such economic conditions as advancing civilization of a highly complex character requires." Stettler v. O'Hara, 69 Or. 519, 139 Pac. 743, Ann. Cases 1916-A, 217; Morrison v. State, 116 Tenn. 534, 95 S. W. 494. The police power is an attribute of sovereignty and exists without reservations in the Constitution, being founded on the duty of the state to protect its citizens and provide for the safety and good order of society. Deems v. Baltimore, 80 Md. 164, 45 Am. St. Rep. 339, 26 L. R. A. 541; Welch v. Sawsey, 193 Mass. 364, 118 Am. St. Rep. 523, 23 L. R. A. (N. S.) 1160; South Carolina v. United States, 39 Court of Claims, 257, affirmed in 199 U. S. 437, 50 L. Ed. 261, 4 Ann. Cases, 737; N. W. Tel. Ex. Co. v. Minneapolis, 53 L. R. A. 175; State v. Central Lumber Co., 24 S. D. 136, 42 L. R. A. (N. S.) 804. In the exercise of its police powers, the state may require railroad corporations at their own expense, not only to abolish grade crossings, but to build and maintain suitable bridges or viaducts to carry the street or highway across the railroad tracks. Chicago, M. & St. Paul Ry. v. City of Minneapolis, 232 U. S. 430; Erie R. Co. v. Board of Public Utilities Com'rs (N. J.) 98 Atl. 13; Public Service Ry. Co. v. Board of Public Utilities Com'rs (N. J.) 98 Atl. 28; Armour & Co. v. New York, N. H. & H. R. Co. (R. I.) 103 Atl. 1031. The 2nd section of the act of Congress of March 2, 1887, under which plaintiff in error claims, granted "a right of way one hundred feet in width, through said Indian Territory (that was before Oklahoma Territory was organized), and to take and use a strip of land two

hundred feet in width, with a length of three thousand feet, in addition to right of way, for stations, for every ten miles of road, with the right to use such additional ground where there are heavy cuts or fills, as may be necessary for the construction and maintenance of the road-bed, not exceeding one hundred feet in width on each side of said right of way, or as much thereof as may be included in said cut or fill: Provided, That' no more than said addition of land shall be taken for any one station." The plaintiff in error maintains a station in El Reno and Watt street crosses its tracks in its station grounds. If a railroad company is not protected by the Constitution from legislative acts burdening it with the duty of abolishing grade crossings, building and maintaining suitable bridges and viaducts at its own expense to carry a street or highway over its tracks and right of way, irrespective of whether such burdens were imposed by law at the time the company was incorporated or constructed, it is difficult to see how the act of the Oklahoma Legislature effective August 24, 1908, onerating it with the duty of maintaining, unobstructed and in good condition for the use of the public, a highway clear across its entire right of way, impairs its contract or takes its property for public use without just compensation. While it has been held that the easement of a railway company in its right of way is property within the constitutional inhibition against taking for public use without compensation, (see annotation in 24 L. R. A. (N. S.) 1226), the plaintiff in error acquired its right of way from the United States expressly subject (section 9 of the act of March 2, 1887, 24 St. L. 448) to the burden of constructing and maintaining continually all roads and highways crossing its right of way, including the construction and maintenance of bridges over said railway, and expressly subject to the right of the proper authorities to lay out new highways across its right of way. Southern Kansas Ry. Co. v. Oklahoma City, 12 Okla. 82, 69 Pac. 1050. Under the act of March 2, 1887, there is no doubt about the power of the proper state authorities to lay out streets and highways across the right of way of the plaintiff in error without compensation. Albany Northern R. Co. v. Brownell, 24 N. Y. 345; People ex rel. Buffalo v. New York, C. & H. R. Co., 156 N. Y. 570, 51 N. E. 312; Delaware & H. Canal Co. v. Whitehall, 90 N. Y. 21; Boston & A. R. Co. v. Greenbush, 52 N. Y. 510, affirming 5 Lans. 461; Rochester & H. Valley R. Co. v. Rochester, 17 App. Div. 257, 45 N. Y. Supp. 687, affirmed in 163 N. Y. 608, 57 N. E. 1123; People ex rel. Ithaca v. Delaware L. & W. R. Co., 11 App. Div. 280, 42 N. Y. Supp. 1011, 159 N. Y. 545, 54 N. E. 1093;

Long Island R. Co. v. Silverstone, 46 N. Y. S. R. 141, 19 N. Y. Supp. 140; Re Walden, 14 N. Y. S. R. 590. There is no provision in the right of way act of March 2, 1887, expressly exempting the railway company, or its successors, from future legislation onerating it with the duty to construct and maintain the highway across its entire right of way, nor did said act undertake to define specifically all the railroad was obligated to do at highway and street crossings. Franchises and rights of way granted by the public are to be construed strictly against the grantee and liberally in favor of the public. Town of Sapulpa v. Sapulpa Oil & Gas Co., 22 Okla. 347, 97 Pac. 1007; Mitchell v. Tulsa Water, Light, Heat & Power Co., 21 Okla. 243, 95 Pac. 961; State ex rel. Minneapolis v. St. Paul, M. & M. Ry. Co., 98 Minn. 380, 28 L. R. A. (N. S.) 298, 8 Ann. Cases, 1047. A railroad crossing is within itself a continuing source and warning of danger, and laws requiring railroads to construct and maintain crossings, laws providing the method of constructing crossings, and laws designating the extent of the duties imposed upon railway companies, fall peculiarly within the police powers of the state because their purpose is not only to guard the public traveling on the highways from harm and injury, but to protect the railroad company, its employes, and passengers and property from injury. It is to the interest of the railroad company to see that the entire highway or street across its right of way is free from dangerous obstructions or excavations, against or into which travelers on the highway may be thrown from horse vehicles. It is the nature of the horse brute to take fright at a railroad track. Although a railroad company may be guilty of no negligence, nevertheless if an animal takes fright at the track, or at a car or engine standing on the track, it may throw the occupant of the vehicle into the excavation, or the animal may collide with a train. Such has been known to cause derailment. The duty to maintain the highway across its entire right of way takes nothing directly from the railroad company. The cost of maintaining the highway or street unobstructed across its entire right of way is compensated for by the consequential reduction and prevention of loss, which otherwise an obstructed and unsafe highway inflicts upon the railroad itself. Its authority to make the highways safe over its entire right of way, without awaiting the tardy and uncertain acts of city and township officers, puts the railroad company in a position where it can minimize accidents to the traveling public and its employes, as well as damages to its own property. The act of the Legislature is not a taking of property without just compensation within the meaning of the Fifth amendment

to the federal Constitution. Knox v. Lee, 12 Wall. (U. S.) 457; L. & N. R. v. Mottley, 219 U. S. 467; Hamilton v. Ky. Dist. & Warehouse Co., 251 U. S. 146. The police power of the state can neither be abrogated, bargained away, nor alienated, even by express grant, and all contracts and property rights are acquired subject to its fair exercise (Chicago & Alton R. Co. v. Tranbarger, 238 U. S. 68; Chicago, Milwaukee & St. Paul R. Co. v. City of Minneapolis, 232 U. S. 430); and neither the **contract clause** nor the **due process clause** in the federal Constitution overrides the power of the state to establish necessary and reasonable regulations under its police power (Atlantic Coast Line R. Co. v. City of Goldsboro, 232 U. S. 548.) In the exercise of the State's police power, it was competent for the Oklahoma Legislature to require railroad companies to construct crossings over their entire rights of way and maintain the same unobstructed in good condition for the use of the public. The power is clearly sustained in Great Northern Ry. Co. v. Clara City, 246 U. S. 434 and Boston & M. R. Co. v. County of York, 79 Me. 386, 10 Atl. 115. But it is argued that plaintiff in error acquired its right of way from the United States and that its franchise operates as a contract between it and the federal government, exempting it from the power of the state to require the railroad to do any thing additional at highway crossings. Suffice it to say, that prior to the admission of Oklahoma as a state, the federal government held in trust the police power of the future state and as the trustee thereof, had no power to enter into any contract (and it did not in this case) with a corporation or individual to abrogate, barter away, or limit the inherent sovereignty of the future state. To hold otherwise would be a denial of the constitutional right of a new state to be admitted on an equal footing with the original states. The federal government has no authority, prior to the admission of a future state, to enter into any contract with a corporation or individual to exempt such individual or corporation from the exercise by the future state of all the sovereignty possessed and vested in one of the original states. While the federal government had full sovereignty in the Indian Territory at the time the act of Congress of March 2, 1887, was passed (Late Corp. of L. D. S. v. United States, 136 U. S. 1-68, 34 L. Ed. 478; Chicago, Rock Island & Pacific R. Co. v. Gist [decided June 15, 1920] 79 Okla. 8), and was vested with the police powers in the territories (United States v. Dewitt, 9 Wall. 41, 19 L. Ed. 593; Moses v. United States, 50 L. R. A. 532; 14 Cyc. 528), it had no authority under the federal Constitution to surrender or contract away the police power of the future state. Upon

the admission of Oklahoma as a state, the powers and sovereignty of the federal government were withdrawn, except those the federal government can rightfully exercise in any other state under like circumstances. It has been repeatedly declared by the United States Supreme Court that the government of the United States has no power except such as expressly or by necessary implication has been granted to it, while the several states may exert such powers as are not inconsistent with the Constitution of the United States nor with a republican form of government. Recent utterances of the Supreme Court of the United States, construed by some to indicate the contrary, are insufficient to convert the several states of this "indestructible union of indestructible states," into mere provinces and thus overturn that fundamental conception of the federal government concurred in by publicists, statesmen, and jurists for more than a century, and announced by that court in this language: "It must, nevertheless, be conceded that the government of the United States is one of delegated, limited and enumerated powers * * *" and "therefore, every valid act of Congress must find in the Constitution some warrant for its passage." United States v. Harris, 106 U. S. 629-644; Grafton v. United States, 206 U. S. 333, 51 L. Ed. 1084. Upon the admission into the Union, Oklahoma possessed all the police powers and sovereignty possessed by one of the thirteen original states, and this status of equality was recognized and expressly declared in the title to the Enabling Act itself. See Hawkins v. Bleakly, 243 U. S. 217; Coyle v. Oklahoma. 221 U. S. 568; United States v. Sandoval, 231 U. S. 38; Kansas v. Colorado, 206 U. S. 95. When the railroad company accepted its right of way, it accepted the same subject to the implied authority of the future state, erected out of said territory through which its right of way extended (state of Oklahoma), to exercise that same quantum of police power possessed by the thirteen original states. State ex rel. Minnesota v. St. Paul M. & M. Ry. Co., 98 Minn. 380, 28 L. R. A. (N. S.) 298, and authorities heretofore cited.

2. Plaintiff in error relies upon Enid City Ry. Co. v. City of Enid, 43 Okla. 778, 144 Pac. 617, wherein this court held that the street railway company's franchise specifically obligating it to "construct or pay the cost of construction of the total width in area along the streets so occupied, or six and two-thirds feet for each track occupying such streets," etc., was a contract entered into prior to statehood, the impairment of which by the said city of Enid was prohibited by section 10 of article 1 of the federal Constitution. After the admission of Oklahoma as a state, the city of Enid undertook to compel the street railway company to pave not only all that portion of the street it had expressly agreed to pave, but, in addition thereto, two feet on each side, as provided for by section 610, Rev. Laws 1910. This court correctly held that section 610, Rev. Laws 1910, should not be given a retroactive effect so as to destroy vested rights or so as to impair the obligations of contracts. We also held that the ordinance of the city of Enid, passed in pursuance of that section of the laws of 1910, undertaking to impose the additional burden on the street railroad company, was invalid. That was just a clear case of the city trying to gouge the railway company. That case did not involve the exercise of the police power of the state. The street railway company accepted its franchise and performed its duties under that franchise; it lived up to its contract and had performed all of its terms. No element of the police power was involved. If the city could add the paving of 26 inches additional, it might just as well have added 26 feet additional. Neither the public safety, health, nor morals was promoted by the ordinance—quite to the contrary, because it was unjust and unreasonable for the city to undertake to impair its express contract with the railway company. Neither the health, safety, good order, comfort, nor general welfare could be promoted by the city breaching its solemn contract with the street railway company. States, municipalities, and other sub-divisions of the state are bound by the same high standard of good faith and morals required of individuals. One of the noblest traits of an individual citizen is that high sense of honor which makes his word as good as his bond. The state furnishes forums, the courts, to compel its citizens to live up to their contracts, but of late years there is a growing and alarming tendency to do collectively the very things all good and fair-minded men condemn in the individual. The breach of its solemn contract by a state or municipal corporation, instead of promoting the public morals, is in fact unmoral and unsafe, because the vitality of the individual conscience will not long survive a benumbed and perverted public conscience. In monarchies Constitutions are made primarily to protect the subject from the tyranny and despotism of the Crown. In democracies Constitutions are made for minorities, and not majorities; they are made to protect the minority from the avarice, greed, tyranny, and despotism of the majority. The majority can protect itself. An individual or corporation cannot escape from the obligations of a contract entered into with a state or city, simply because the contract has become onerous and burdensome; then why should a contract between the state or city and another person

be impaired or abrogated because, perchance, a majority of the city council, or even the voters, have arrived at a preponderating public opinion that the general welfare of the community demands an impairment or nullification of the contract. As neither the state nor the municipality can surrender by contract the governmental power to guard the safety, morals, health, and good order of society, a contract purporting to do so is void ab initio, and being void, it is impossible to speak of laws in conflict with its terms as impairing the obligations of a contract. In legal contemplation such contract contains no obligations. Freund's Police Power, sec. 362. But where the terms and obligations agreed upon between the state or municipality on the one hand and a corporation or individual on the other are the proper subject-matters of a contract between such parties, and not of the class discussed in L. & N. R. Co. v. Mottley, 219 U. S. 467, their contract, plainly specifying the duties of the parties, legally entered into, falls within the protection of the contract clause of the federal Constitution, and it is not within the police power of the state or municipality to impair the same. A broad doctrine that all contracts are made impliedly subject to future legislative alteration is either false or the contract clause of the Constitution has ceased to function. We trust the Constitution has not yet become a shuttle-cock of public opinion, and that the despotic doctrine that "might is right" has not and will not displace in this Nation government within constitutional limitations. The police power has expanded during recent years into dangerous proportions, and it behooves us not to forget that "eternal vigilance is the price of liberty."

3. Plaintiff in error contends that section 611, Rev. Laws 1910, being a part of an act of the Legislature of 1907-1908, is in conflict with section 1432, Rev. Laws 1910, being the act effective August 24, 1908. Section 611 authorizes the city council to require a steam railroad company, "where any steam railroad company shall cross with any street that is being or has been paved," to pave "so much of said street as may be occupied by its track or tracks and two feet on each side, and when more than one track crosses such street within a distance of one hundred feet, measuring from inside rail to inside rail, said railroad company shall grade, gutter, drain, curb, pave, or improve between its said tracks in the same manner as the city may be improving or has improved the other portion of such street." It does not appear from the record that Watt street in the city of El Reno has ever been paved. There is no repugnance between section 611 and section 1432. Both are operative within their spheres. The things which the city council may require a steam railroad to do, under the authority of section 611, are in no sense inconsistent with the requirements of section 1432. While section 1432 applies to streets and alleys in cities, towns, and villages, as well as highways in the country (Southern Kansas Ry. Co. v. Oklahoma City, 12 Okla. 82, 69 Pac. 1050), it leaves to the railroad the power to choose its own method of constructing a safe crossing and maintaining the same unobstructed in a good condition. That section does not prescribe the material, that is, plank, stone, brick, concrete, etc., the railroad company shall use, or the manner of construction and maintenance. Section 611 not only applies to crossings in cities, but also applies to steam railroads "running in the general direction of such street, either on or adjacent thereto," and requires the railway company to improve the space between its tracks and two feet on either side thereof "in the same manner as is required of street railway companies." Section 610 prescribes the duties of street railway companies running in and longitudinally with the street. Section 1432 evidently does not contemplate steam railroads running in the general direction of public highways, as it is generally impracticable to operate a steam railroad along and in a public highway. Section 611 not only prescribes the duties of steam railroads when they run in the general direction of a street, but also confers upon the city council and authorities the power to require railroad companies at street crossings "to pave so much of said street as may be occupied by its track or tracks and two feet on each side, and when more than one track crosses such street within a distance of one hundred feet, measuring from inside rail to inside rail, said railroad company shall grade, gutter, drain, curb, pave, or improve between its said tracks in the same manner as the city may be improving or has improved the other portion of said street." Taking section 611 and section 1432 together, we have this: It is the duty of the railroad company to construct and maintain unobstructed, in a safe condition, crossings over its entire right of way, in such manner as the railroad company, at its own risk, shall adjudge to be proper, the city having the authority, however, to require the railroad company, under section 611, "to pave so much of said street as may be occupied by its track or tracks and two feet on each side, and when more than one track crosses such street within a distance of one hundred feet, measuring from inside rail to inside rail," and also to "grade, gutter, drain, curb, pave, or improve between its tracks in the same manner as the city may be improving or has improved the other portion of said

street." The city cannot require the railroad company to pave the entire right of way unless its tracks are so situated as to burden it with that duty under section 611. The city may pave or improve the balance of the right of way in such manner as it deems proper, and require the railroad to pave in like manner that part of the railroad right of way designated in section 611. When the city exercises its powers conferred by section 611, it takes over the duty and responsibility of maintaining that part of the crossing over the railroad right of way not covered by the paving and improvement required of the railroad company by section 611. The exercise by the city of its powers conferred by section 611 may or may not excuse the railroad from maintaining a part of the street crossing its right of way. That depends on the width of its right of way and number and location of its tracks. The city cannot require more of the railroad than it is doing, but can require the company to improve in the same manner the city is improving the street.

4. The evidence shows that the railroad company maintained five tracks across its right of way at Watt street; that the outer rail lying next to the excavation was about 27 feet from the edge of its right of way; that the excavation began at a point about 13 or 15 feet from the outer rail of the outside railway track, and extended along in the street on the north side of the side walk, in what one of the witnesses says would have been the parking, and out several feet beyond the edge of the right of way; that it was about three or three and one-half feet deep; that some one, probably the city or the lumber company whose yards were adjoining the street, put a guard rail on one side of said hole, at a right angle with the street, leaving the excavation unguarded from the direction of the railway right of way and from the direction of the street; that the excavation was partly on the right of way and partly beyond the right of way; that the city used said excavation as a catch basin for drainage purposes, and had a large drainage pipe leading into the excavation and another one leading out; that the plaintiff, with her husband and child, was in a buggy drawn by a horse, traveling on Watt street, towards the railroad track, for the purpose of going over the crossing; that just as they drove up to the track, an engine came up, emitting steam, from which the horse took fright. It is shown that the horse did take fright and backed into the excavation, the buggy falling on the plaintiff, from which she suffered injuries. The plaintiff in error contends that the city had the right to use said excavation on said right of way within the street, and had the right to lay pipes and mains in the streets. It also says that the city had the right to lay pipes and mains across the railway company's right of way, and we concede that to be true so long as the city laid them so they would not interfere with the railway company's use of its right of way for railway purposes. Section 608, Rev. Laws 1910, authorizes the mayor and city council of any city not only to establish and change the grade of streets, avenues, lanes, alleys, and public places, but to permanently improve them, "including the installing of all manholes and catch-basins, whenever, in their judgment, the public convenience may require such improvements, subject only to the limitations prescribed in this chapter." An open catch-basin or open and unguarded excavation of the character disclosed by the evidence in this case could not be maintained rightfully or legally by the city authorities in a street on the railway company's right of way without first acquiring the right by the exercise of the city's power of eminent domain. While the city had the right to lay a street across the railway company's right of way without condemning it, such street not being inconsistent with the railway company's easement and use of its right of way for railway purposes, the city had no authority to maintain an unguarded catch-basin or open excavation on any part of the railway company's right of way in or off the street, without first acquiring that right by the exercise of the power of eminent domain. An open excavation of the character disclosed by this record would render it extremely inconvenient or impossible for the railway company to use its right of way at that point for railway purposes. The company would either have to fill the excavation or cover it. We are unable to understand how the city would have any right to maintain such an unnecessary open excavation on the company's right of way, especially in a public highway. It is common knowledge that railway tracks within themselves are not only a warning of danger to the traveler, but are objects at which animals take fright. The city and railroad company are chargeable with notice of the characteristics of animals, and their likelihood to become frightened at railroad crossings, and it was their duty either to close the excavation, cover it over, or protect it by guard rails. The act in maintaining the open excavation in the street, partly on the railway company's right of way and partly in the street off its right of way, being an unauthorized obstruction, is a nuisance. Dygert v. Scheneck (N. Y.) 35 Am. Dec. 575; State v. Mobile (Ala.) 30 Am. Dec. 564; Commonwealth v. Wilkinson (Mass.) 26 Am. Dec. 654; Elliott on Roads and Streets, vol 2, sec. 827; Mills v. Hall, 9 Wend. (N. Y.) 216, 24

Am. Dec. 160; City of Superior v. Roemer (Wis.) 141 N. W. 250. Lapse of time would not legalize such a nuisance. The city should have been made a defendant in this case, because, primarily, the fault lies with it. It was the railroad company's duty to maintain an unobstructed crossing over its entire right of way, and it was at fault in suffering the city to maintain the excavation partly on its right of way in such close proximity to its railroad tracks, when it must have foreseen that travelers in horse-drawn vehicles would probably be injured by it remaining open and unguarded. A horse at that point might have become frightened at the railroad tracks, or a box car or engine rightfully standing on the tracks nearby, although the railroad company was guilty of no negligent act in any way contributing to the horse's fright, other than the simple fact that its tracks were present or the box car or engine was rightfully standing on or near the crossing. Whether the company's engineer negligently, uselessly, and recklessly emitted steam from the engine, which frightened the horse, is not essential to the plaintiff's case, if we be correct in holding that it was the duty of the company and the city to either fill the excavation, cover it over, or place guard rails around it. McDowell v. Preston, 104 Minn. 263, 18 L. R. A. (N. S.) 190; Ruker v. Huntington (W. Va.) 25 L. R. A. (N. S.) 143; Kennedy v. New York, 73 N. Y. 365, 29 Am. Rep. 169; Baldwin v. Greenwoods Turnp. Co., 40 Conn. 238, 16 Am. Rep. 33; Georgia R. & Bkg. Co. v. Mayo, 92 Ga. 223, 17 S. E. 1000; Henderson & C. Gravel Road Co. v. Cosby, 103 Ky. 182, 44 S. W. 639; Baltimore & Y. Turnp. Road v. Crowther, 62 Md. 567, 1 Atl. 279; Baltimore & L. Turnp. Co. v. Cassell, 66 Md. 419, 59 Am. Rep. 175, 7 Atl. 805; Baltimore & H. Turnp. Co. v. Bateman, 68 Md. 389, 6 Am. St. Rep. 449, 13 Atl. 54; Baldridge & C. Bridge Co. v. Cartrett, 75 Tex. 628, 13 S. W. .8. Anyone wishing to further investigate this line of authorities should examine the annotation to Denver v. Utzler, 8 L. R. A. (N. S.) 79, wherein the annotator says that the "weight of authority and the better reasoning seem to support the doctrine that the municipality is liable where a horse takes fright without any negligence on the part of the driver, at something for which the municipality is not responsible, and gets beyond the control of the driver, and runs away and comes in contact with some obstruction or defect in the road which the city has been negligent in not removing or repairing, if the injury would not have been sustained but for such obstruction or defect." A great number of authorities are cited in support of this doctrine. St. Louis & S. F.

R. Co. v. Bell, 58 Okla. 84, 159 Pac. 336, goes further than this holding.

We find no prejudicial error, and the judgment of the trial court is therefore affirmed.

HARRISON, V. C. J., and PITCHFORD, JOHNSON, and McNEILL, JJ., concur.