**SOUTHERN OKLAHOMA ROYALTY OWNERS ASS'N et al.**

v.

**STANOLIND OIL & GAS CO: et al.**

Nos. 35737–35739.

Supreme Court of Oklahoma.

Feb. 2, 1954.

Fischl & Culp, Ardmore, for plaintiffs in error.

Floyd Green, Conservation Atty., Ferrill H. Rogers, Asst. Conservation Atty., Corporation Comm., L. A. Thompson, Oklahoma City, Wilbur Heard, Tulsa, Norton Standeven, Robinson, Shipp, Robertson & Barnes, Oklahoma City, by T. Murray Robinson, Oklahoma City, for defendants in error.

ARNOLD, Justice.

Three appeals by Southern Oklahoma Royalty Owners Association from orders of the Corporation Commission granting Stanolind Oil and Gas Company location exceptions and permission to complete certain wells for the production of oil from two separate sands in the Southwest Sholem Alechem Field, Carter County, are here consolidated.

The record before us shows that:

Three producing formations, each with a common source of supply, underlie this field. The first is the Humphreys sand, the most productive of the three, which is encountered at 5,400 to 6,400 feet from the surface; the next is the Sims, which lies from 300 to 400 feet below the Humphreys; and the last is the Goodwin, lying some 700 to 1,000 feet below the Sims and the least productive of the three. On January 5, 1952, Stanolind Oil and Gas Company filed with the Commission three applications, similar in content, asking that orders be made fixing spacing and drilling units for each of these three formations, and alleging that a number of wells had been drilled or were being drilled within the area and such wells should be determined to be the well for the drilling and spacing unit in which such well is located. Protests were filed by plaintiffs in error; after hearings and on April 30, 1952, the Commission entered its order on each application, fixing the drilling and spacing units for these three formations as follows: for the Humphreys, 20-acre spacing and drilling units, the wells to be located in the center of the northwest and southeast 10 acres of each quarter quarter section; for the Sims, 40 acre drilling and spacing units, the wells to be located in the center of the northeast 10 acres of each quarter quarter section; for the Goodwin, 40 acre drilling and spacing units, the wells to be located in the center

of the southwest 10 acres of each quarter quarter section. Each of these orders granted exceptions to certain specifically named wells, drilled or drilling at the time of this order, among these being the Mc-Daniel No. 1, located in the center of the SE¼ NE¼ NE¼ of Section 9, Township 2 South, Range 3 West (which under the pattern established should have been a Humphreys well) which was established as the Goodwin well for that particular 40-acre space of which it was a part, and the Sid Spears No. 1 well located in the center of the northeast 10 acres of the SE¼ of the SW¼ of Section 29 (which under the established pattern should have been a Sims location) was established as a Humphreys well. These orders were unappealed from and became final.

On June 26, 1952, Stanolind filed three applications with the Commission. In the first application, No. CD 3887, it stated that it had drilled the C. E. Kidd No. 1 well in the southeast 10 acres of the NW¼ SE¼ Section 10, the H. A. Brady No. 1 in the southeast 10 acres of NW¼ NE¼ Section 9, and the L. E. Redmond No. 1 in the southeast 10 acres of SE¼ SE¼ Section 4 (all of which are Humphrey locations and that to prevent waste and protect the correlative rights of the owners and others interested therein it desired to dually complete each of said wells and produce them, together with the McDaniel No. 1 well (which as heretofore stated was on Humphreys location but had been granted an exception as a Goodwin well), from both the Goodwin and the Humphreys sands, and prayed for an order permitting completion of the three Humphrey wells to the Goodwin sand and the dual production of all four wells from the two sands.

In the second application, No. CD 3988, Stanolind alleged that prior to the entry of the spacing order it had drilled the C. Johnson A-1 well, located in the southeast 10 acres of the NW¼ SE¼ of Section 4 and the C. Johnson B-1 located in the southeast 10 acres of SE¼ NE¼ Section 4 (which were Humphreys locations) and asked permission to complete the said wells in the Sims sand.

In the third application, No. CD 3999, it alleged that prior to the entry of the spacing order it had drilled the Sid Spears No. 1 well located in the center of the northeast 10 acres of the quarter quarter section (this was the well which was on a Sims location but which the spacing order established as a Humphreys well for that quarter quarter section) and asked permission to complete said well to the Goodwin sand and dually produce same from both the Humphreys and Goodwin sands. In each of the applications requesting permission to produce wells dually it was alleged that one sand would be produced through the tubing and the other sand through the annulus between the casing and the tubing, thus keeping the production of each common source of supply separate.

To each of these applications plaintiffs in error filed protest and objections alleging that the Commission was without jurisdiction to grant the location exceptions applied for because said applications alleged no grounds for such exceptions, that the applications constituted a collateral attack upon the spacing orders of April 30, 1952, and that the granting of the applications would establish irregular and nonuniform drilling and spacing units in violation of the statutes, and that the spacing and drilling unit orders of April 30, 1952, are res adjudicata of all matters set out in said applications.

The three applications and protests thereto were consolidated for hearing before the Commission. In support of its applications Stanolind introduced testimony by a geologist and a petroleum engineer to the effect that there are three productive common sources of supply in this field, known as the Humphreys, the Sims, and the Goodwin sands; that all three sands underlie each of the 40-acre spacing units here involved; that Stanolind would obtain no structural advantage were the exceptions allowed; that there would be very little, if any, difference in drainage or in the production from the sand involved by reason of such change in location from the prescribed drilling pattern; that the same number of wells drilled into the common source of supply should produce the same

amount of oil, regardless of the size of the common source of supply, provided the wells were reasonably spaced; that the approximate cost of drilling a Goodwin well was $120,000; that on the basis of a scale wide survey the Goodwin pay sand averaged about 27 feet; that to operate it over a period of 12 years would result in a loss of about $46,000; that if the operator were required to drill a Goodwin well at the prescribed pattern location and produce it just as a Goodwin well Stanolind would not drill most of them; that were the Kidd well (at present a Humphrey well and on pattern) completed to the Goodwin sand about 24,000 barrels of oil would be recovered during the life of the well from the Goodwin sand; that a like recovery could be expected if a Goodwin well were drilled on pattern in the southwest 10 acres of that particular 40-acre unit; that such a well drilled on pattern, costing $120,000 to drill and $48,000 to operate over a 12-year period, would not be economically feasible; that the Brady well (also a Humphrey well drilled on pattern) if completed to the Goodwin sand could recover about 50,000 barrels from that sand; that the cost of drilling a Goodwin well and the operation thereof if drilled on pattern in that 40-acre unit would be the same as in the Kidd well unit; that the Redmond well if drilled to the Goodwin sand would recover about 100,000 barrels and the cost of drilling and operating a well in that 40 acre unit would be the same as in the other two units; that the McDaniels well would be comparable to the Brady; that the cost of drilling a Sims well was about $100,000 and the operating cost about $48,000; that the Johnson wells would recover about 150,000 barrels each if allowed to be drilled to the Sims sand; that the cost of drilling a Humphreys well was about $100,000 plus about $30,000 operating costs; that the Spears well if completed to the Goodwin sand would recover only about 10,000 barrels from that sand; that the Spears well (which was completed as a Humphreys well) was now a gas well; that to drill another Goodwin well in each of the units involved would cause the operator to lose money on each Goodwin well drilled; that these wells can be dually completed by set-

ting a packer between the sources of supply and producing one through the tubing and the other through the annulus between the casing and the tubing; that the granting of the exceptions asked for will result in more ultimate recovery from the reservior; that the Brady, both Johnson and McDaniels wells were all completed in 1951; that the Redmond and Kidd wells were started in 1952 and completed before the issuance of the spacing order on April 30, 1952; that the Spears well was started in May, 1952 and completed in June, 1952; that all of the wells except the Kidd and Spears wells were completed prior to the spacing order and they were drilling at the time; that the Kidd well was completed on pattern as a Humphrey sand well subsequent to the date of the order and the Spears well, which was a proposed Sims test well and on location for the Sims, was a dry hole in the Sims, and it was drilled on down to the Goodwin; that it would not be economically feasible if the exceptions were not granted to drill another well to the Goodwin sand at a cost of $120,000 in view of the recovery which could be expected.

Protestants introduced no evidence save copies of the spacing orders and their protests thereto. Thereafter the case was closed and taken under advisement.

On July 31, 1952, the Commission issued its reports and orders on each of the three applications, all of which are similar in content, making findings of fact concerning the spacing orders, the applications, and finding that in order to prevent economic waste and to prevent the drilling of unnecessary wells the exceptions prayed for in the applications should be granted and entered its order accordingly. Motions for new trial and for more specific findings of fact were filed by the protestants, all of which were denied giving rise to this appeal.

■ Plaintiffs in error first contend that the orders appealed from are unconstitutional because the Commission has no authority under the police power to so administer conservation of natural resources as to guarantee a profit to or lessen the costs of an operator in complying with spacing and drilling units theretofore fixed

and because the exceptions granted will result in a nonuniform pattern of spacing and drilling; that whether an operator makes a profit or not is a private matter over which the Commission has no jurisdiction and can grant no relief; that under the record here the only "waste" shown is the economic waste which would be suffered by the operator alone if forced to drill the wells on pattern, which "waste" is not a matter of public concern or welfare.

52 O.S.1951 § 86.2 defines waste as:

"The term 'waste', as applied to the production of oil, in addition to its ordinary meaning, shall include economic waste, under-ground waste, * * *."

and charges the Commission with the duty "to make rules, regulations, and orders for the prevention of such waste". There is substantial evidence in the record that to require the drilling of additional wells to the various sands, instead of utilizing the wells already drilled, would place such a financial burden upon the operator, because of the small recovery of oil which could be anticipated, that the operator would sustain a loss and would therefore not drill the wells, thus preventing the largest ultimate recovery of oil. If, as contended by plaintiffs in error, the term "economic waste" used in the statute does not contemplate the waste of valuable material, skill, labor, and gas fuel in the drilling of unnecessary wells, which to our mind it does, certainly the oil left in place and unrecovered because it would be too costly to drill a separate well to recover it is "economic waste" representing a loss to the landowner and royalty interest holders as well as to the state at large. The evidence is clear that if the exceptions are permitted there will be no loss to the landowners, but a gain in that more oil can ultimately be recovered. This we think is within the authority of the Commission to do.

While it is true, as plaintiffs in error urge, that 52 O.S.1951 § 87.1(a) provides that well spacing and drilling units shall be of approximately uniform size and shape, the same section gives the Commission authority to make such exceptions as may be reasonably necessary upon application, notice and hearing, if it finds that any such spacing unit is located at the edge of a pool and adjacent to a producing unit, or for some other reason that to require the drilling of a well at the prescribed location on such spacing unit would be inequitable and unreasonable, not only to the operator but to the owners of the mineral rights. As heretofore mentioned, nowhere does it appear that the correlative rights of the landowners and others interested would be injured by the orders made granting exceptions; to the contrary it appears that such rights would be benefitted.

Plaintiffs in error next contend that the spacing and drilling orders are res adjudicata of everything alleged in the applications for exceptions and such applications constitute a collateral attack upon such orders. They further contend that before the Commission could grant such exceptions it would have to find that there was a change of condition to justify same, and no change of condition was shown.

The matters contained in exception orders were not adjudged in the spacing and drilling unit orders; these are all new questions which have arisen. No change of condition need be shown. The problem could not be decided before it arose; it was only after drilling the wells that the information was obtained upon which the applications are based. It was contemplated by the Legislature in providing for exceptions to be made upon application, notice, and hearing that problems would arise from time to time in the development of a field which would require amendment or readjustment of the original spacing and drilling unit order.

Plaintiffs in error next contend that the evidence does not justify nor sustain the orders. We find substantial evidence to support the orders, as above outlined.

Lastly, plaintiffs in error allege that the orders are void because they contain insufficient findings to justify the orders. In the first order, in cause No. CD 3987, the Commission found:

"That in order to avoid economic waste and to prevent the drilling of unnecessary wells, this application should be granted."

638

In cause CD 3988, the Commission found, among other things:

"That it would constitute economic waste to require applicant to plug said well and to redrill same at the location provided for in said Order No. 25782 and that therefore this application should be granted."

In Cause No. CD 3989 the Commission found:

"That it would constitute economic waste to require applicant to plug the above described well and to redrill same at the locations provided for by Orders numbered 25780 and 25781, and that economic waste will be caused, in that the cost of drilling said well would exceed the probable recovery of oil and gas therefrom.

"That in the interest of securing the greatest ultimate recovery of oil in the field, and the prevention of economic waste, this application should be granted."

These findings are sufficient to sustain the orders, and the orders are supported by substantial evidence.

Affirmed.