**TENNECO OIL COMPANY, a corporation, Appellee,**

v.

**EL PASO NATURAL GAS COMPANY, a corporation, Appellant.**

No. 53201.

Supreme Court of Oklahoma.

July 17, 1984.

Rehearing Denied Sept. 11, 1984.

As Corrected Sept. 13, 14 and Oct. 10, 1984.

H.B. Watson, Jr., Richard K. Books, Watson, McKenzie & Moricoli, Oklahoma City, for appellee.

David T. Burleson, Rand C. Schmidt, El Paso, James M. Gaitis, Robert J. Emery, Emery, McCandless, Gaitis, Bruehl & Gerstandt, P.C., Oklahoma City, for appellant, El Paso Natural Gas Co.

DOOLIN, Justice:

The cleavage within this Court, as demonstrated by this case, arises from deciding whether, after a forced-pooling order is issued by the Oklahoma Corporation Commission, the parties named as operator, and as electee or poolee, may contract between themselves to enlarge or otherwise define the terms set forth in the pooling order. Restated the question posed is this: may the interested parties to a forced-pooling order contract as to interests created, duties defined, terms of participation, operations, etc.?

. We hold they may.

A majority of this Court believes that such a contract is permissible, while the

minority takes the view that such a voluntary contract is impermissible, an usurpation, and an attack on the public policy (police power) exercised by the Commission. Those who espouse the permissibility of the operating agreement believe that the forum to decide the rights and duties of the pooling order and its offspring, the operating agreement, is the traditional law or District Courts of Oklahoma. The opposing view would fix the forum for deciding such controversy within the framework of the Corporation Commission. Both opinions agree that the statutory power to administer the "conservation act" is fixed in the Corporation Commission of Oklahoma, 52 O.S.1981, § 81 et seq. and 17 O.S.1981, § 52.

■ The Constitution of Oklahoma provides in Art. IX, § 19 that the Corporation Commission shall have the power and authority of a Court of Record; [1] it may likewise punish for contempt, enforce its lawful orders, etc. Its power over oil and gas matters stems from statutory enactments (not mentioned in the Constitution) which of course must not be inconsistent with the constitutional provisions.

Without specifying, or further tracing the conservation act, suffice to say that the Corporation Commission is charged with enforcement of the conservation as to both oil and gas.[2]

This case began as one sounding in equity, a quiet-title action, filed by Tenneco Oil Company, a corporation (Tenneco), against El Paso Natural Gas Company, a corporation (El Paso), praying that the District Court of Roger Mills County, Oklahoma quiet Tenneco's interest in certain oil and gas leases covering the party's interest in Section 6, TWN 13 N, RN 24 West I.M., Roger Mills County, Oklahoma. Tenneco further asked for a decree judicially determining Tenneco's right to participate in the

---

1. It is a tribunal of limited jurisdiction, *Burmah Oil & Gas Company v. Corporation Commission,* 541 P.2d 834 (Okla.1975); *Kingwood Oil Company v. Hall-Jones Oil Corporation,* 396 P.2d 510 (Okla.1964).

2. Oil, 52 O.S. 1981, § 276; gas, 52 O.S. 1981, 241.

operation of a producing well, together with other injunctive relief.[3]

Prior to filing suit in December of 1976, the Corporation Commission, pursuant to 52 O.S.1971, § 87.1, had established a drilling and spacing unit of 640 acres for gas and gas condensate from certain common sources of supply underlying Section 6, TWN 13 N, RN 24 West I.M., Roger Mills County. Thereafter the Corporation Commission force-pooled the interest of Tenneco and El Paso by order dated May 9, 1977. Title 52 O.S.1971, § 87.1(d) [presently 52 O.S.1981, § 87.1(e)] provides in part:

"... When two or more separately owned tracts of land are embraced within an established spacing unit, or where there are undivided interests separately owned, or both such separately owned tracts and undivided interests embraced within such established spacing unit, the owners thereof may validly pool their interests and develop their lands as a unit. Where, however, *such owners have not agreed to pool* their interests and where one such separate owner has drilled or proposes to drill a well on said unit to the common source of supply, *the Commission,* to avoid the drilling of unnecessary wells, or to protect correlative rights, *shall,* upon a proper application therefor and a hearing thereon, *require such owners to pool and develop their lands* in the spacing unit as a unit ..." (Emphasis supplied).

Both Tenneco and El Paso sought to be named the unit operator.

By the order described aforesaid, Tenneco was designated as operator of the unit; however, if Tenneco did not commence operations for drilling within 90 days from

May 9, 1977, then El Paso should become the operator. Paragraph 9, *infra.*

The forced-pooling order further provided for payment of a cash bonus of $175.00 per acre plus an overriding royalty of $\frac{1}{16}$ of $\frac{7}{8}$ on oil and $\frac{1}{8}$ of $\frac{7}{8}$ on gas if a party did not participate.[4]

Paragraph 9 of the pooling order provided:

"That in the event a party has elected to participate in the drilling of the unit well and has paid to Tenneco Oil Company in cash (or has furnished Tenneco Oil Company evidence of such party's ability to pay) its pro rata share of the cost of drilling the unit well, and if Tenneco Oil Company fails to commence operations for drilling the unit well within 90 days from the date of this order, then Tenneco Oil Company shall immediately pay over to El Paso Natural Gas Company such cash payments, or deliver to El Paso Natural Gas Company the evidence of such party's ability to pay. In the event El Paso Natural Gas Company becomes unit operator, Tenneco Oil Company shall have 15 days (beginning with the first day when El Paso Natural Gas Company becomes the operator) to elect whether to participate in the working interest of the proposed well and shall have five days thereafter within which to pay to El Paso Natural Gas Company (or furnish to El Paso Natural Gas Company satisfactory evidence of its ability to pay) its proportionate part of the cost thereof."

Tenneco was unable to meet the drilling commencement deadline of 90 days and notified El Paso on July 21, 1977, or July 22, 1977,[5] by telephone, later confirmed by letter dated July 27, 1977.

---

**3.** Injunctive relief as prayed for is not an issue dealt with in this opinion.

**4.** Cost of drilling completion and equiping was estimated by the order at $2,389,200.00.

Paragraph 8 of forced-pooling order required an election within 15 days of its date, May 9, 1977, by all parties who owned an interest in the premises. It was assumed that if an owner made no election, then he had effected an election to accept the cash bonus and overriding royalty interests in lieu of participation.

Payment of the estimated cost by such an electee was due 20 days from the date of May 9, 1977.

**5.** Tenneco alleged and presented evidence that on this date it notified El Paso of its election to participate which was hotly contested by El Paso. On August 4 or 5, 1977, El Paso moved onto Section 6 and commenced operations toward drilling.

Chronologically the next step was that El Paso sent Tenneco an executed operator's agreement on August 11, 1977. Tenneco did not immediately sign the operator's agreement but did so on September 6, 1977, and mailed same to El Paso who received it on September 7, 1977.

Meanwhile El Paso, by letter dated August 31, 1977, tendered the cash bonus to Tenneco under the Corporation Commission forced-pooling order, which Tenneco returned. Thereafter Tenneco brought its action against El Paso on November 8, 1977 [6] in the District Court of Roger Mills County.

The trial court on November 12, 1978 granted judgment in favor of Tenneco, finding the operating agreement modified the forced-pooling order of the Corporation Commission and holding that Tenneco was entitled to its proportional production based on its ownership of leases within the 640 acre spacing. In due course a timely appeal was effected by El Paso and by an opinion rendered October 19, 1982,[7] we reversed the Court of Appeals with directions to dismiss Tenneco's cause of action for want of subject-matter jurisdiction.

By this opinion granting rehearing, we vacate the previous opinion of this Court and affirm the action of the trial court.

■ There can be little doubt that questions as to jurisdiction may be raised at any time by the parties and by the Court on its own motion.[8] The same rule applies to orders and decrees of the Oklahoma Corporation Commission.[9] In *Dickson v. Dickson*, 637 P.2d 110 (Okla.1981) we cited *Hawkins v. Hurst*, 467 P.2d 159 (Okla. 1970) holding the Supreme Court of Oklahoma must inquire into its own jurisdiction *as well as the jurisdiction* of the trial court, whether or not raised by a party.

We are critical and condemn the use of the word "modify," a derivative, or synonym thereof, as used in the trial court's journal entry of judgment when describing the effect of the operator's agreement on the order of the Commission within the purpose of the conservation act. The purpose of 87 O.S.1981, § 81 et seq. is contained in the title given to the chapter in its codification. It is codified as an act whose purpose is the *conservation* of oil and gas and the duty fixed thereby is entrusted to the Corporation Commission. We have held many times that the Commission is a constitutional body possessed of executive, legislative and judicial powers. The statutes provide that the Commission shall prohibit and control waste and shall protect correlative rights. The rationale behind such duty is that the Corporation Commission shall look after the rights of the body politic.

■ At the risk of oversimplification, we hold the enactments for the conservation of oil and gas are public in nature and that the spacing order, the pooling order, and the order fixing allowables, to name but a few of its functions, are within the realm of the public rights to be protected. Thus, the spacing order sets the stage for development and guards the public interest in developing an orderly and judicious drilling program. It is aimed at protecting the interest of all, by the prohibitions against waste. The forced-pooling order, among other things, represents the interest of consumers and mineral interests and disallows the "dog in the manger" attitude, which would deny economic development.

In an economy of scarcity, a body such as Oklahoma Corporation Commission serves well.

---

6. El Paso brought in a producer after the suit was filed.

7. *Tenneco Co. v. El Paso Natural Gas Company,* 53 OBJ 2476, 2481 (1982).

8. *Durham v. Sharum,* 203 Okl. 426, 222 P.2d 1029 (1950); *Wright v. Kemper,* 137 Okl. 259, 279 P. 346 (1929).

9. *Woods Petroleum Corporation v. Sledge,* 632 P.2d 393 (Okla.1981) citing *Wright v. Kemper,* supra; *Application of Central Oklahoma Milk Producers Association,* 312 P.2d 500 (Okla.1957), a Corporation Commission case.

■ This is not to say that the rights to produce the designated quantity of hydrocarbons from the well and the division thereof, the public interest, and the owner-operator interests are not the proper subject of a private contract. The limitation being *always omnipresent* is that no private contract or operating agreement may cause or grant a license to commit waste,[10] or diminish correlative rights,[11] control of which is exclusively within power of Corporation Commission.[12] The Corporation Commission is a tribunal of limited jurisdiction, *Burmah Oil & Gas Company v. Corporation Commission,* supra, and *Kingwood Oil Company v. Hall-Jones,* supra. Respective rights and obligations of parties are to be determined by the district court, *Southern Union Production Company v. Corporation Commission,* 465 P.2d 454 (Okla.1970).

■ The conflict or dichotomy as to subject-matter jurisdiction between Courts and Administrative Agencies has not been perfectly defined, by any Court; however, recently the Supreme Court in *Northern Pipeline Company v. Marathon Pipeline,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), dealt with the matter as public versus private rights. It held:

"This doctrine may be explained in part by reference to the traditional principle of sovereign immunity, which recognizes that the Government may attach conditions to its consent to be sued. But the public-rights doctrine also draws upon the principle of separation of powers, and an historical understanding that certain prerogatives were reserved to the political branches of government. *The doctrine extends only to matters arising 'between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments,'* and only to matters that historically could have been determined exclusively by those departments. The understanding of these cases is that the Framers expected that Congress would be free to commit such matters completely to nonjudicial executive determination, and that as a result there can be no constitutional objection to Congress' employing the less drastic expedient of committing their determination to a legislative court or an administrative agency.

The public-rights doctrine is grounded in a historically recognized distinction between matters that could be conclusively determined by the Executive and Legislative Branches and matters that are 'inherently ... judicial.'

.    .    .    .    .

The distinction between public rights and private rights has not been definitively explained in our precedents. Nor is it necessary to do so in the present case, for it suffices to observe that *a matter of public rights must at a minimum arise 'between the government and others.'* In contrast, *'the liability of one individual to another under the law as defined,' is a matter of private rights.* Our precedents clearly establish that *only* controversies in the former category may be removed from Art. III courts and delegated legislative courts or administrative agencies for their determination. *Private-rights disputes, on the other hand, lie at the core of the histor-*

---

**10.** For definition of waste: oil, 52 O.S. 1981, § 86.2; gas, 52 O.S. 1981, 86.3.

**11.** *United Petroleum Exploration, Inc. v. Premier Resources, Ltd.,* 511 F.Supp. 127 (W.D.Okla. 1980):

"... correlative rights are those rights which one owner possesses in a common source of supply in relation to those rights possessed by other owners in the same common source of supply [which is] the underlying geological strata from which the oil and gas is produced, rather than the well through which the oil and gas is reduced to possession." See also *Kingwood Oil Company v. Hall-Jones,* supra. "Basis for enactment for state's oil and gas conservation laws is to protect correlative rights. *Inexco Oil Company v. Corporation Commission,* Oklahoma, 628 P.2d 362 (1981)."

**12.** *Cabot Carbon Company v. Phillips Petroleum Company,* 287 P.2d 675 (Okla.1955); *Southern Union Production Company v. Corporation Commission,* 465 P.2d 454, 457 (Okla.1970).

*ically recognized judicial power."* (Emphasis supplied).

*Northern v. Marathon,* supra, arose after *Northern* had applied for reorganization under the bankruptcy court. *Northern* filed proceedings in that court against *Marathon* for damages arising from breach of contract, warranty, misrepresentation and coercion. *Marathon* sought dismissal on grounds that only Art. III Judges (those judges possessing life tenure and protection against diminution of salary) could hear such matter and the attempted delegation of power to the bankruptcy court was unconstitutional. The Supreme Court observed in part:

"... the restructuring of debtor-creditor relations, which is the core of the federal bankruptcy power, must be distinguished from the adjudication of ... private rights such as the right to recover contract damages that is the issue in this case ... "

Although admittedly Tenneco did not seek damages, the relief sought was equitable and private in nature and was *not* an attack upon the public rights function of the Corporation Commission, *i.e., to regulate and administer the conservational laws and policies of the sovereign state.*

Custom and usage, as those terms are legally understood, is not the basis for our holding. We are extremely doubtful that custom and usage may decide a forum, confer jurisdiction, or define private versus public-rights issues. "Custom or usage repugnant to expressed provisions of statute is void."[13]

No amount of custom or usage can change the constitutional[14] status and powers of the district courts or the constitutional and statutory powers of the Corporation Commission.[15]

What has approached custom is the practice within the industry (oil and gas) to refine, broaden, and specify duties between pooled interests in a spacing unit to provide specific rights and obligations between the parties. Without attempting to limit or list all such areas covered by operating agreement, and by way of examples, we mention: procedures for payment, methods of accounting, liabilities of parties, regulations of expenditures, procedures for default, etc. Particularly within the realm of costs and payment, the operating agreement may substitute and approve a farm-out agreement as a method of division and may define the interests of such parties, giving one the working interest and the other royalty.

It is likewise common within the industry for the pooling agreement to be in existence and executed between some of the parties interested in the common source of supply and not executed by a "forced party." The forced-party's interest, of course, comes into existence after the forced pooling order is issued, and invariably at a later date than the voluntary agreement between parties.[16] The forced-pooling order does not usually address such items as percentage of the interests owned by the parties, costs as to title examination or insurance, failure of title, successive operators by resignation, not to mention taxes, waiver or non-waiver of partition rights, etc.

In short, the forced-pooling order generally, and specifically in this case, is "bare bones"; many, many problems commonly encountered in the industry must be and were covered by an operating agreement.

At the fear of being repetitious, we repeat: no attempt is made by any party in the instant case to change or challenge the public issue of conservation of oil and gas;

---

13. *Okla. N.M. & P. Ry. Company v. Downey,* 116 Okl. 253, 244 P. 173 (1926).

14. Art. VII, § 1.

15. Art. IX, § 18 et seq., 17 O.S. 1981, § 51, et seq.; 52 O.S. 1981, § 81, et seq.

16. If a strict enforcement of a public-rights approach is made, this may lead those parties forced to pool with a forum in the Corporation Commission and those parties voluntarily pooling with a private contract enforced by the district court. What would be the forum of a dispute between a forced party and a voluntary party?

all items in the operating agreement are private and thus properly presented to the district court.

El Paso asks us to declare and hold that the evidence necessary to establish an election under the forced-pooling order issued by the Corporation Commission should be "clear and convincing," rather than the lesser requirement applied herein by the district court of a "mere preponderence." It points out that the precise point as to the nature of the burden of proof necessarily assumed by Tenneco in this case has not been defined by this Court. We are disinclined to assign a "clear and convincing" standard of proof under forced-pooling orders, under the circumstances of this case.

Heretofore we have required that in adverse possession matters, the elements necessary to establish adverse possession must be established by clear and positive proof.[17] Likewise such a standard is required for reformation of a written instrument (oil and gas lease).[18]

The Supreme Court of Idaho in *Lynch v. Cheney*, 561 P.2d 380 (Idaho 1977), has correctly observed at pg. 385:

> "The rationale for a 'clear and convincing' evidentary standard rests in the value the law places on the integrity of a formal writing."

*Lynch v. Cheney*, supra, concerned itself with an allegation that a wife had agreed orally to cancel arrearages on a written judgment.

When we analyze the evidence and issues in the instant case, we are immediately struck and observe that Tenneco, the party which must bear the burden of quieting its title, does *not* challenge the sanctity or integrity of a written judgment, order or instrument. At issue is the meaning of provisions in the forced-pooling order dealing with election, such as, "the owners should be required to elect," "and in the event that such ... owners do *not* make such election ..." and ... "in the event a party has elected," to cite examples.

It cannot be argued successfully or established by the evidence that the forced-pooling order issued herein requires a written notice of election, or any given method for that matter. An election can be written, oral, by estoppel, or according to statute, rule, or regulation, to name but a few methods. Such a fact (election), an element of Tenneco's proof in the quiet title action, must be proved by a preponderance of the evidence. Tenneco simply states it made an election under the Commission order; it does not challenge, attack, or seek to interpret such order. Neither can the Corporation Commission be faulted. It knows that hundreds of the owners of mineral estates or interests who are subject to pooling or spacing orders are relatively unsophisticated and may not possess knowledge, experience, or expertise enough to make a formal election.

Lastly, we concern ourselves with the standard of review to be applied by the appellate courts to matters of equity. There is no doubt this Court must examine the evidence and determine if the trial court's judgment is clearly against the weight of same. If the judgment is not clearly against the weight of the evidence, then we should affirm.[19]

We have carefully weighed the evidence herein and, although conflicting, find the judgment rendered not clearly against the weight of the evidence.[20]

17. *Pavlovitch v. Wommack*, 206 Okl. 158, 241 P.2d 1119 (1952); *Rodgers v. International Land Co.*, 111 Okl. 98, 238 P. 407 (1924).

18. *Davis v. Keeche Oil & Gas Company*, 89 Okl. 226, 214 P. 711 (1923). Same standard as to establish a constructive trust, *Hayden v. Dannenberg*, 42 Okl. 776, 143 P. 859 (1914).

19. *Caywood v. January*, 455 P.2d 49 (Okla.1969), it is "well settled that a quiet title action is an action of equitable cognizance. The judgment of the trial court in an action of equitable cognizance will not be disturbed on appeal unless it is clearly against the weight of evidence citing *Priddy v. Shires*, 204 Okl. 664, 233 P.2d 298 (1951); *Tenneco Oil Company v. Humble Oil & Refining Company*, 449 P.2d 264 (Okla.1969) and *Moree v. Moree*, 371 P.2d 719 (Okla.1962).

20. *Fry v. Hurst*, 293 P.2d 552 (Okla.1956), "where evidence in a quiet title action was conflicting a judgment of the trial court was not against its clear weight, court on appeal would

Neither is the evidence contrary to law or established principles of equity;[21] nor do grounds for reversal exist when it is possible to draw another conclusion.[22]

Opinion of this Court dated October 19, 1982, vacated; rehearing granted; trial court affirmed.[23]

SIMMS, V.C.J., and LAVENDER, HARGRAVE, ALMA WILSON and KAUGER, JJ., concur.

BARNES, C.J., and OPALA and HODGES, JJ., dissent.

OPALA, Justice, joined by BARNES, Chief Justice, and HODGES, Justice, dissenting:

The opinion holds that the district court may settle disputed claims to participation rights conferred by, and acquirable through compliance with, the terms of a forced-pooling order of the Corporation Commission [Commission or Agency]. Because I deem these controversies to lie within the *exclusive* jurisdiction of the Commission, I recede from today's pronouncement.

I

THE DISPUTE

The dispute arises from a pooling order conferring on Tenneco [appellee] provisional operator status conditioned on commencement of operations within ninety days. If Tenneco failed to do so within this period, El Paso [appellant] would become the unit operator. Tenneco would, in such event, have fifteen days to elect to participate in the drilling of the proposed well or to accept, in lieu of it, a royalty interest with cash bonus. The pooling order did not specify how the election was to be communicated to El Paso and this ambiguity gave rise to the present controversy. Tenneco sued in the district court to quiet its asserted title to a contested working interest and contended that it did communicate to El Paso its intention to participate in the well. El Paso argued that Tenneco failed timely to elect. Another dispute in the case concerned a joint operating agreement which Tenneco contended was binding on the parties. According to Tenneco's position, this agreement allowed it to participate in the costs and proceeds of the well quite apart from a valid election. The trial court ruled in Tenneco's favor, finding both a properly communicated election and a valid operating agreement.

II

A SHARED EXERCISE OF JURISDICTION

It has been suggested that this case is suitable for an exercise of shared cognizance by both court and agency. Some commentators have urged that we seize upon the opportunity and adopt here the doctrine of primary jurisdiction.[1] That doctrine is said to offer Oklahoma a solution to the problem of dichotomous court/agency jurisdiction which is much to be preferred over the current search for some elusive bright line of demarcation separating judi-

not *reverse judgment quieting title* ... (case concerning a mineral reservation).

**21.** *Story v. Hefner,* 540 P.2d 562 (Okla.1975); *Mayfair Building Company v. S & L Enterprises, Inc.,* 483 P.2d 1137 (Okla.1971).

**22.** *Rivers v. Parker,* 382 P.2d 16 (Okla.1963) and *Brown v. Greever,* 379 P.2d 689 (Okla.1963).

**23.** Insofar as *Chancellor v. Tenneco Oil Company,* 653 P.2d 204 (Okla.1982) is in conflict herewith same is expressly overruled.

**1.** Primary jurisdiction comes into play whenever enforcement of the claim requires resolution of issues which under a regulatory scheme have been placed within the special competence of an administrative agency. Thus, in order for primary jurisdiction to be invoked the claim must involve issues that fall within the scope of the regulatory scheme. District courts have original jurisdiction of all controversies unless the jurisdiction has been assigned to some other body by statute. See Barnes, Interpretation of Corporation Commission orders: The Dichotomous Court/Agency Jurisdiction, VIII *Okla.City L.Rev.* 311, 327–330; Chatfield, Subject Matter Jurisdiction of the Oklahoma Corporation Commission: *Tenneco Oil Co. v. El Paso Natural Gas Co.,* 19 Tulsa L.J. 465, 474–479 [1984].

cial from administrative competence.[2] The primary jurisdiction doctrine calls for judicial deference to administrative primacy over issues that lie within the special expertise or cognizance of an agency. When raised in a court action, these issues must be referred for agency resolution *before* the court may proceed to grant the judicial relief sought. There are several variations of this doctrine and scholars do not agree which of these is to be regarded as the orthodox version.[3]

Institutional interplay of courts with agencies doubtless would be an improvement over the rigidity of maintaining two separately-structured jurisdictional corridors. But it would not *dispense* with having to draw a line of demarcation between district court "issues" and those lying within the exclusive cognizance of the Commission. That boundary is presently plagued by lack of an articulately defined location.[4]

Because I find no "court issues" in this case but only matters exclusively within agency jurisdiction, there appears to be no basis for giving consideration to applying here the flexibility of institutional interplay provided by the doctrine of primary *jurisdiction.*

### III

### THE COMMISSION'S EXCLUSIVE JURISDICTION OVER ELECTION-RELATED ISSUES

The first issue before the district court was whether Tenneco did timely communicate to El Paso its intention to participate in the well. Because the pooling order was silent as to the manner of communicating an election, resolution of that issue called for the district court (a) to supply the missing terms in the pooling order and (b) to determine Tenneco's compliance with the

**2.** Barnes, supra note 1 at 330; Chatfield, supra note 1 at 482.

**3.** Chatfield, supra note 1 at 474–475.

**4.** Extant case law is not easily reconcilable nor does it provide guidance in charting a path that divides judicial and agency jurisdiction compatible with constitutional and statutory purpose. These decisions, far from creating a bright line of demarcation, clearly point out the confusion with respect to the court/agency dichotomy. The zones of authority saved to the special jurisdiction of the Commission and those which are within the general powers of the district court have become increasingly blurred as the Legislature and the administrative agencies create new patterns of regulation that were unknown at common law. In *Central States Power & Light Corp. v. Thompson,* 177 Okl. 310, 58 P.2d 868, 870 [1936], the Commission was held not to have jurisdiction over a controversy involving rates charged to natural gas customers, even though the Commission had itself established the rates. The decision was based on a public interest/private rights dichotomy. *Southern Union Production Co. v. Corporation Commission,* Okl., 465 P.2d 454, 457–458 [1970], held that the Commission could not construe or interpret its own prior pooling order. (For a thoughtful analysis and discussion of this case, see Hart, Interpreting Corporation Commission Orders—Should the Commission be a Spectator or a Player? 48 Okl.B.J. 1343 [1977]). But in *Southern Oklahoma Royalty Owners Ass'n v. Stanolind Oil & Gas Co.,* Okl., 266 P.2d 633, 637

[1954] the court held that some terms could be *modified* on changed conditions. And in *Cabot Carbon Co. v. Phillips Petroleum Co.,* Okl., 287 P.2d 675, 679 [1955], the court recognized Commission power to *clarify* its previous orders without threatening jurisdiction of the courts. *Amarex, Inc. v. Baker,* Okl., 655 P.2d 1040, 1043 [1983], later distinguished *Cabot Carbon* and *Southern Union* by stating that the Commission's order in *Southern Union* constituted the Commission's opinion as to *legal effect* of rights on drilling and subsequent plugging of a test well; since the order was not expressly or impliedly authorized by Constitution or statute, it was beyond the Commission's authority. (See *Chatfield,* supra note 1 at 485, for a criticism of this analysis.) *Amarex* held that express statutory intent need not limit administrative jurisdiction, but powers could be "implied as reasonably and necessarily incident to those expressly granted". Okl., 655 P.2d 1040, 1045 [1983]. *Continental Tel. Co. v. Hunter,* Okl., 590 P.2d 667, 668 [1979], indicated only that the constitution and statutes limit the Commission's legislative, judicial and executive powers. In his special concurring opinion thereto, Opala, J., at 669–670, noted that Oklahoma's constitution gives the Commission *"exclusive original jurisdiction over rate making ...* to preserve inviolate the commission's constitutional responsibility to protect the rate-paying public as a whole." Dictum in *Crest Resources & Exploration Corp. v. Corporation Comm'n,* Okl., 617 P.2d 215, 218 [1980], further indicated that the Commission has jurisdiction to adjudicate liability arising from disputed cost overruns under a pooling order.

terms (those expressly shown and those supplied) of the Commission order and its policies. The district court is explicitly prohibited by statute from entertaining suits for declaration of rights acquired under an order of the Corporation Commission.[5] Our fundamental law, Art. 9 § 20, Okl. Const., denies with equal clarity to *all* courts, except the Supreme Court, the power to review Commission orders.[6] Lastly, Commission orders made pursuant to the oil-and-gas conservation statutes may be reviewed *only* in the Supreme Court.[7] Cognizance to interpret and construe pooling orders is withdrawn from the district courts. Most recent jurisprudence from

this court limits district court power over Commission orders to ascertaining whether the order is facially void.[8] Extant decisions that prohibit varying forms of collateral attack on Commission orders are in accord with this statutory and constitutional demarcation of jurisdiction.[9]

The conclusion to be drawn from case law is that when a pooling order is *facially void* for want of notice, a district court may declare it ineffective,[10] *but* if the working interest owner, deprived of participation option by want of notice, seeks an opportunity to elect, the Commission constitutes the *sole tribunal* with power to grant relief.[11] Because El Paso sought to invali-

5. The terms of 12 O.S. 1981 § 1657 provide: "This act [Uniform Declaratory Judgments Act] *shall not be applicable to orders*, judgments, or decrees made by the State Industrial Court, the *Corporation Commission,* or any other administrative agency, board or commission of the State of Oklahoma." [emphasis added].

6. The adjudicative power of the district court seems to overlap—at least facially—with that which stands assigned to the Commission. *Stipe v. Theus,* Okl., 603 P.2d 347, 350 [1979]. In Art. 7 § 7, Okl. Const., the root source of that power is present. That section is often *partially quoted* to infer that there are no constitutional limits to the power of the district court since the district court has "... unlimited original jurisdiction of all justiciable matters ..." This familiar phrase must be read together with the less-often used part of that section which qualifies its effect with the language "... except as otherwise provided in this Article, and such powers of review of administrative action *as may be provided by statute ...*" [emphasis added]. Art. 7 § 7, Okl. Const. Any court—other than this court (Art. 9 § 20, Okl. Const.)—is statutorily denied the power to review Commission orders made pursuant to the oil-and-gas conservation statutes. 52 O.S. 1981 § 111; *Woods v. Sledge,* Okl., 632 P.2d 393, 394 [1981]. This takes Commission pooling orders out of the constitutional rubric of "justiciable matters" and places them in the second category of district court cognizance—that of "review of administrative action". The latter is relegated by our fundamental law to allocation by legislative discretion. Courts are constitutionally prohibited from interfering with the Commission's exercise of its adjudicative functions. Art. 9 § 20, Okl. Const.
The Commission is explicitly invested with jurisdiction of cost-overrun disputes over the ultimate liability attachable to the interest-holders.

52 O.S. 1981 § 87.1(e); *Stipe v. Theus,* supra. *Stipe v. Theus* demonstrates that money judgments based on a final adjudication of the Commission are matters of private law and fall back into the "justiciable issues" within the jurisdiction of the district court. Accord: *Shell Oil Company v. Keen,* Okl., 355 P.2d 997, 1000 [1960] which sanctions a private action for an accounting that is based upon a final order of the Commission. See also *Olansen v. Texaco, Inc.,* Okl., 587 P.2d 976 [1978].

7. 52 O.S. 1981 § 111; *Woods Petroleum Corp. v. Sledge,* supra note 6.

8. *Gulfstream Petroleum Corp. v. Layden,* Okl., 632 P.2d 376 [1981] and *Chancellor v. Tenneco Oil Co.,* Okl., 653 P.2d 204, 207 [1982]; see also *McDaniel v. Moyer,* Okl., 662 P.2d 309, 312–313 [1983].

9. Whether an application to the Commission for a second or supplemental order, based on a prior order, may present issues that remain open for litigation, is a question dealt with in the following cases: (1) absent a vitiating infirmity, an order pooling interests is *res judicata* (*Crest Resources and Exploration Corporation v. Corporation Commission,* supra note 4 at 218); (2) some terms may be modified upon changed conditions (*Southern Oklahoma Royalty Owners Ass'n v. Stanolind Oil and Gas Co.,* supra note 4 at 637) or clarified under 52 O.S. 1981 § 112 (*Cabot Carbon Co. v. Phillips Petroleum Co.,* supra note 4 at 679).

10. *Gulfstream Petroleum Corp. v. Layden,* supra note 8; *Chancellor v. Tenneco Oil Co.,* supra note 8.

11. In *Cravens v. Corporation Commission,* Okl., 613 P.2d 442, 444 [1980], a Commission order establishing a drilling and spacing unit was reversed for want of a constitutionally sufficient

date Tenneco's election not on the basis of facial invalidity but because of Tenneco's alleged noncompliance with the terms of the Commission's pooling order, subject-matter cognizance of the dispute resided *solely* in the Commission.

When the Legislature placed the pooling order under the charge of the Commission, it did so with the directive that it should be made after notice and hearing and "upon such terms as are just and reasonable" to insure each pooled owner his "just and fair share of the oil and gas".[12] Under this delegation, the Commission fashions pooling orders and prescribes their special terms. These include the so-called "election to participate" which operates to bar participation on one's failure timely to elect under the provisions of an order.[13]

In short, the so-called election is the progeny of the statutorily-created pooling order and a regulatory device of the Commission. It is hence clear the first issue in this case was outside the district court's jurisdiction.

The second issue presented to the district court was couched in terms of a private contractual dispute. The district court held the contract *"superseded and modified"* the terms of the pooling order.

Implicit in the resolution of the second issue below—that the critical pooling order provisions stood "modified and superseded" by the Tenneco/El Paso operating agreement—is the trial court's clearly erroneous assumption that an election right may be altered by *less than all* of its holders acting without approval of the Commission. An option to convert one's interest is made available in the exercise of the state's nondelegable police power as an instrument of governmental policy. It may be viewed neither as a "private playhouse" nor as a product of contract law.

Because the state cannot surrender or share its police power with *any* private party, that power cannot be bargained away to anyone, either directly or obliquely.[14] Just as Commission approval is required to change an operator, so is Commission *imprimatur* necessary to modify the pooling order's provision for conversion of mineral interests to participation rights.[15] In sum, the question whether an option holder did timely and effectively exercise his right of election under a pooling

---

notice to owners of mineral interest whose whereabouts and identity were ascertainable.

**12.** 52 O.S. 1981 § 87.1.

**13.** Extant case law clearly upholds the Commission's cognizance of election-related disputes arising after the pooling order's promulgation. In *Gose v. Corporation Commission,* Okl., 460 P.2d 118, 121 [1969], the Commission undertook to hear an application by a working interest owner who sought relief from his failure to elect on the grounds that he had been given no advance notice of the compulsory pooling proceeding. We upheld the Commission power to proceed with a hearing on the application.

*Buttram Energies, Inc. v. Corporation Commission,* Okl., 629 P.2d 1252, 1254 [1981], involved a mineral owner's unsuccessful attempt before the Commission to secure a second pooling order (and opportunity to participate in the unit well) on the theory that the first one was ineffective as to him because the operator had failed timely to tender him the fixed per-acre bonus payment in lieu of participation. This court restated the rule that on a proper application and showing, the Commission has the authority to "amend, modify or supplement" the election provisions of its pooling order.

**14.** Extant case law is clear that the state's police power is inalienable. In *Public Service Co. of Okl. v. Caddo Electric Coop.,* Okl., 479 P.2d 572, 575 [1971], it is stated that "a reasonable exercise of the police power of the state cannot be contracted away by contracting parties". In *National Bank of Tulsa Bldg. v. Goldsmith,* 204 Okl. 45, 226 P.2d 916, 921 [1951]—in the context of our workers' compensation law—it was noted that the *"police power is an attribute of sovereignty or in effect is sovereignty, and the State and its police power cannot be separated".* [emphasis added]. There we also stated that it is "fundamental that *the Legislature of a state may not part with any of its right to exercise the police power".* [emphasis added]. In short, *police power is both nondelegable and inalienable.* See also: *Chicago R.I. & P. Ry. Co. v. Taylor,* 79 Okl. 142, 192 P. 349, 354 [1920]; *Arneson v. Shary,* 32 S.W.2d 907, 910 [Tex.Civ.App.1930]; *Schmitt v. F.W. Cook Brewing Co.,* 187 Ind. 623, 120 N.E. 19, 21 [1918]; *Stone v. State of Mississippi,* 101 U.S. [11 Otto] 814, 25 L.Ed. 1079, 1080 [1879]; *Banker v. Jefferson County Water Control & I. Dist.,* 277 S.W.2d 120, 122 [Tex.Cr.App. 1955]; *American Federation of Labor v. Watson,* 60 F.Supp. 1010, 1016 [S.D.Fla.1945].

**15.** *Crest Resources and Exploration Corporation v. Corporation Commission,* supra note 4.

order is to be gauged not by the familiar offer-and-acceptance test of the contract law but rather by the holder's compliance with the terms provided in the source by which the right was conferred. That source—the pooling order—is plainly beyond the district court's reach either for construction or clarification.[16] Private parties are not legally free to take greater liberties with a Commission order than may the district court.

If a claim is rooted in an option afforded by the pooling order, it stems from the Commission's exercise of its regulatory power. It cannot be transformed into a private contract interest by the magic of a subsequent operating agreement. An election right[17] cannot be conferred by private contract. It must have its genesis in the Commission order. Although by contract the parties may vary a pooling order's election provision,[18] they must do so on due notice to all other interested parties and upon a hearing before, and approval of, the Corporation Commission. A contrary rule would enable the operator to discriminate in favor of or against some bearers of the Commission-conferred election rights.

The district court may not—under the guise of its private-law authority to enforce contracts—alter the legal effect of core provisions in a Commission order. Just as the election dispute tendered by the first

issue lies within the Commission's exclusive cognizance, so the Commission-imposed result of an election or non-election under the pooling order may not be negated, modified or abridged by the district court's unwarranted assumption of adjudicative authority over a disguised private contract issue.[19]

Commission orders may not be circumvented by resort to collateral agreements posing as "private contracts". Such agreements do not embody purely private arrangements but are mere extensions of the statutorily created and regulated interest.

In short, the Commission is the proper tribunal to resolve election-related contests. Deference to the Commission's special zone of authority will not create any diminution of judicial power. The judiciary will continue to assert its cognizance over those issues that are properly within the sphere of its history-shaped functions.[20]

The Commission's exclusive jurisdictional authority includes enforcement, interpretation and clarification of its orders.[21] Such authority prohibits district courts from enjoining, reversing or interfering with administrative actions of the Commission.[22]

Oklahoma is long overdue for a bright and consistent boundary line separating district court cognizance from that of the

16. See 12 O.S. 1981 § 1657, quoted at footnote 5, supra; *McDaniel v. Moyer,* supra note 8 at 312.

17. Definition of the election to participate may be found in Nesbitt, A Primer on Forced Pooling of Oil and Gas Interests in Oklahoma, 50 OBJ 648, 652–653 [1979].

18. While parties whose interests are pooled may enter into private agreements governing their relationship, they may not transfer the operator's public-law-delegated status without Commission approval. *Crest Resources and Exploration Corporation v. Corporation Commission,* supra note 4.

19. Otherwise, operators would be given an open-ended range of options in their dealings with interest owners. This freedom of choice would not be consistent with the Corporation Commission's responsibility to control the activities of the operators whose duties are nondele-

gable. *Crest Resources and Exploration Corporation v. Corporation Commission,* supra note 4.

20. Adjudication of claims involving purely private ownership interests is reserved to the courts. *Burmah Oil & Gas Co. v. Corporation Commission,* Okl., 541 P.2d 834, 835, 836 [1975]. District courts may examine Commission orders only to decide the Commission's jurisdiction to issue such orders. *Gulfstream Petroleum Corp. v. Layden,* supra note 8 at 378.

21. The Declaratory Judgments Act grants the Commission exclusive authority to interpret and construe its own orders. See 12 O.S. 1981 § 1657, quoted in footnote 5, supra. See also Chatfield, supra note 1 at 481, 482 and *Constantin v. Martin,* 216 F.2d 312, 317 [10th Cir.1954].

22. Art. 9 § 20, Okl. Const.; see 52 O.S. 1981 § 111; *Woods Petroleum Corp. v. Sledge,* supra note 6 at 396; *Gulfstream Petroleum Corp. v. Layden,* supra note 8.

Commission over disputed claims in the aftermath of a pooling order. Election-related controversies must belong on the same side of the line as those which tender for adjudication rights to drill additional wells in the drilling and spacing unit or to determine additional development costs under a pooling order.[23] We do not further public interest when the line drawn places beyond the Commission's reach those post-pooling-order claims which are vital to the enforcement scheme of its regulatory power.

I would reverse the trial court's judgment with directions to dismiss the action for want of subject-matter jurisdiction.

---

**23.** In *Woods Petroleum Corp. v. Sledge,* supra note 6, the Commission authorized the operator to drill three additional wells on a drilling and spacing unit and allowed the mineral interest owners the opportunity to elect. The operator sought, in the district court, to quiet its title to drill the wells in question and, in effect, determine that mineral interest owners' *failure to elect to participate* in the first well barred their right to participate in the drilling of the additional wells. This court held the quiet title suit constituted an unauthorized collateral attack on the Commission order in that the "Commission has the sole authority to adjust the equities and to protect the correlative rights of interested parties".

In *Amarex, Inc. v. Baker,* supra note 4, the focus of the dispute was on whether the working interest owners' *election to participate* in a well did extend to a second borehole that was drilled when the surface casing broke off in the first borehole. The Commission dismissed—as dehors its jurisdiction—the operator's application for a determination that the costs of the second borehole were to be apportioned among the participating interest owners. *This court held that within the Commission's jurisdictional sweep to determine development costs lie all those implied powers that are necessary to review and construe the meaning of the language used by the Commission in its orders.* Because the question whether the costs of the second borehole constituted proper well costs had not been explicitly resolved by the Commission, we directed it to hear the operator's application.