Raymon HAYMAKER and Jewell Haymaker, Appellants,

v.

OKLAHOMA CORPORATION COMMISSION and Union Texas Petroleum Corporation, Appellees.

No. 63792.

Court of Appeals of Oklahoma, Division Nos. 2 and 4.

Aug. 26, 1986.

As Emending Nov. 17, 1986.

Vincent Mesis, Jr., Collier, Mesis & Collier, Inc., Hennessey, for appellants.

Val R. Miller, Crowe & Dunlevy, Oklahoma City, for appellee Union Texas Petroleum Corp.

Cheri Wheeler, Deputy General Counsel for Conservation, Oklahoma Corp. Com'n, Oklahoma City, for appellee Oklahoma Corp. Com'n.

## OPINION

BRIGHTMIRE, Presiding Judge.

The issue presented in this appeal is whether substantial evidence supports the Oklahoma Corporation Commission's order denying applicants' request for permission to drill a second well on an established and productive 80–acre spacing unit.

We hold it does not and vacate the order.

### I

Applicants are the owners of minerals underlying an 80–acre tract of land in Kingfisher County. It lies in an area known as the Dover-Hennessey field and was developed in the early 1960's in accordance with a Commission order establishing 80–acre drilling and spacing units. The well in question, Haymaker No. 1, was drilled on subject tract by Union Texas Petroleum Corporation in 1963 and achieved production from the Oswego and Meramac formations. By 1967 the Meramac formation had become unproductive. After being reworked and recompleted to an additional geologic strata, the well attained an initial commingled production of about 71 barrels a day from the Oswego and Big Lime formations. Cumulative oil production for the well through April 1984 stood at 172,000 barrels.

During the 1970's and early 1980's, the drilling of new wells in this area was in-

spired by skyrocketing oil prices and the prolific production of a well, near Haymaker No. 1, completed in the newly discovered Misener formation. Some of the new wells failed to encounter a productive Misener sand, however, and those that did soon became unproductive. Attempts were then made to save these wells by recompleting in various uphole formations such as the Oswego and Big Lime. Production from these wells ranged from poor to respectable.

It was under these circumstances that the Haymakers' application was filed December 13, 1983, seeking permission to drill a second well on their land. Notice of hearing the application was given. Union Texas appeared in opposition to it. The matter was heard by a trial examiner on April 24, 1984. Both applicants and Union Texas offered expert geological testimony. The experts agreed that Haymaker No. 1 was the single most successful producing well in the field, but that it would probably not be able to recover all hydrocarbons underlying it. The main issues upon which the experts disagreed were with regard to the probable rate, quantum and longevity of Haymaker No. 1's production. Haymakers' expert opined that the existing well would recover only about 5,000 more barrels of oil out of an estimated reserve of about 40,000 barrels. The Union Texas expert on the other hand thought the well would recover about 15,000 barrels but did not state what he thought the total reserve was.

To support his opinion that a second well would be profitable, applicants' expert produced the details of his economic feasibility studies. The Union Texas expert, on the other hand, as we will see, merely referred to a conclusion reached by Union Texas. After hearing applicants' evidence, Union Texas moved the examiner to dismiss the application for failure to show a change of condition. The trial examiner took the matter under advisement, heard Union Texas' evidence, and on July 11, 1984, found and concluded that (1) the motion to dismiss should be denied because the applicants had shown "a change in knowledge of con-

dition ... based on production and development that has occurred since the establishment of 80 acre units," and (2) a second well "would be an economically reasonable development and that there would be a waste of reserves if this increased density well is not drilled."

Union Texas filed exceptions to the report of the trial examiner. These were later heard by a Commission referee in a proceeding with an adversarial format. He confirmed the examiner's findings and affirmed her recommendations. Union Texas excepted to the referee's conclusions also, and thereby laid the predicate for a hearing by the Commissioners themselves. Two members of the Corporation Commission purported to hear the matter on October 31, 1984. The "hearing" lasted about ten minutes, after which the two Commissioners "disapproved and denied" the recommendations of the examiner and referee and issued Order No. 271223, denying the Haymakers' application. The denial was based on the conclusory "findings" that "an additional well on said 80–acre unit would only result in faster recovery of the recoverable hydrocarbons and would be wasteful.... and [it would] upset rather than protect correlative rights of others." Applicants appeal.

## II

The sole complaint of the Haymakers is that the order is not supported by substantial evidence as required by law. We agree.

 The law is, of course, that the Corporation Commission has wide discretion in the performance of its legal duties, and its findings of fact and legal conclusions must be upheld by the reviewing court unless the findings are not supported by substantial evidence or the conclusions are contrary to law. *Shell Oil Co. v. Davidor & Davidor*, 315 P.2d 259 (Okl.1957). And what is "substantial evidence"? It is that which possesses substance and relevance and will induce conviction that the order made was proper. *Union Texas Pe-*

*troleum v. Corporation Commission,* 651 P.2d 652 (Okl.1981).

██ The issues that the Commission was required by law to resolve in passing on the application were two-fold: (1) Would the requested well result in illegal waste? and (2) Would such a well offend the correlative rights of adjoining mineral owners?[1] As we mentioned earlier, the Commission found the ultimate facts to be that a second well would result in waste and, if drilled, the "correlative rights of the various interested parties" would not be protected.

In order to determine whether these two ultimate facts are supported by the required quantum of proof, it is necessary to first review the statutory definitions of waste and of material correlative rights and then consider the relevant evidence. Title 52 O.S.1981 § 86.2, defines waste in part as follows:

"The term 'waste', as applied to the production of oil, in addition to its ordinary meaning, shall include economic waste, underground waste . . .; the use of reservoir energy for oil producing purposes by means or methods that unreasonably interfere with obtaining from the common source of supply the largest ultimate recovery of oil; [and other acts not relevant here]."

With regard to the matter of economic waste the high court recognized in *Kuykendall v. Corporation Commission,* 634 P.2d 711 (Okl.1981), that everyone has a right to drill on his own land subject to the power of the state "to prevent unnecessary loss, destruction, or waste." The court then talked about oil discoveries "in increasingly deeper formations," the constantly rising costs of drilling and producing, and the fluctuation of the market prices of oil and gas. These are economic realities "which cannot be ignored" by the Commission in determining whether changing the size of a drilling unit or modifying well density would constitute waste, said the court. For "shifting economic sands" may justify a Commission finding of fea-

sibility today of that which tomorrow it might well find to be "waste". An example of such a change, of course, is the dramatic rise and fall of oil prices seen during the era in which that opinion was written.

Though *Kuykendall* did not refer to *Southern Oklahoma Royalty Owners Association v. Stanolind Oil & Gas Co.,* 266 P.2d 633 (Okl.1954), its views seem to be in harmony with those expressed in that earlier case. In *Southern,* a group of royalty owners opposed three applications of the lessee seeking permission for dual production from three producing horizons underlying the subject field, each comprising a common source of supply. It wanted to be excused from drilling a well in the location specified in a Commission order for wells producing from the other zone, and instead wanted permission to produce the second zone from its existing well. More specifically the position of Stanolind was that a well was producing from the Humphrey strata and it wanted permission to produce from the deeper Goodwin sand at the same time from the same well—the Humphrey through the tubing and the Goodwin through the annulus between the casing and the tubing, a method which would enable it to keep separate track of production from each common source—rather than drill a new well at the location prescribed for Goodwin production. Its argument was that if required to comply with the spacing order by drilling a new well at the specified location, the probable quantity of recoverable Goodwin reserves would not justify the drilling and operating expenses incurred and would result in economic loss. As a result, Stanolind said it would not drill new wells to the Goodwin and the oil would not be recovered, causing waste and detriment to the royalty owners.

The royalty owners on the other hand apparently did not challenge Stanolind's evidence, but contended that the Commission had no constitutional authority to guarantee a profit to a producer, lessen its costs,

---

1. The law permits additional wells within established spacing units if such wells will prevent waste and protect correlative rights of persons interested in a common source of supply.

or save it from losses by allowing exceptions to established Commission orders without showing a change of condition.

The Commission granted the requested exceptions and the royalty owners appealed. In upholding the Commission's order the *Southern* court said that "[i]t was contemplated by the Legislature ... that problems would arise from time to time in the development of a field which would require amendment ... of the original spacing and drilling unit order [and] it was only after drilling the wells that the information was obtained upon which the applications are based.... No change of condition need be shown." The court then recognized some interestingly broad definitional implications of the statutory phrase "economic waste." One was that it encompasses a situation where oil remains unrecovered because it is worth less than the cost of recovery. Another was that the term contemplates "the waste of valuable material, skill, labor, and gas fuel in the drilling of unnecessary wells." And finally the court said that failure to develop known reserves and realize the largest ultimate recovery of oil left in place and unrecovered would be waste, not only to the mineral owner, but to the State—a conclusion, parenthetically, which today is challenged by some whose philosophy is that production should be related to need and that overproduction leads to waste of the limited resource.

 So much for the definition of economic waste. What about the meaning of "correlative rights" among owners of the common source of supply? Generally speaking, in legal contemplation, the term refers to all the rights and duties which exist between mineral owners with regard to a common source of hydrocarbon supply. One fundamental right, based on the law of capture, is that each mineral owner sharing a common source of supply is entitled to extract the oil and gas beneath his land. And to protect this right, the courts have recognized the existence of various reciprocal rights and duties among multiple supply owners, some of which overlap the

waste proscription. For instance, one owner has no right to waste, spoil, damage or maliciously deplete the common source of supply or do anything that deprives another owner of a reasonable opportunity to extract his fair share of the deposit.[2]

### III

Evidence in the case at bar consists of both hard evidence and expert opinions. It is the latter that is conflicting.

The controversy centers first of all on the capability of Haymaker No. 1, a reliable well producing nine barrels of oil per day, a rate which is decreasing annually at a rate of ten to twelve percent, to produce the rest of its supply. There is no suggestion of waste through disproportionate or wrongful depletion of reserves. The experts agreed, as mentioned earlier, that the Haymaker well would not, during its productive life, exhaust all its available oil reserves. They divided on the amount of the supply it could recover. Applicants' expert said the existing well would probably not recover more than about twelve percent, or 5,000 barrels, of the estimated 40,000-barrel Oswego/Big Lime reserve. Union Texas' expert thought the recovery would be closer to 15,000 barrels and that that would be "most" of the reserve pool. The applicants' reserve estimate was not clearly challenged. Haymakers' expert therefore concluded that substantial untapped reserves would remain unrecovered unless a second well was drilled to the Oswego/Big Lime zones in the west half of the spacing unit.

In order to properly evaluate the situation, Haymakers' expert geologist, Richard Newville, determined the drainage area by performing volumetric calculations on the No. 1 well. He factored in such things as the porosity and depth of the formation and the cumulative production from the well, then attributed the production to one of the two producing formations—an approach which would give the largest or "worst case" drainage area—and concluded that

---

**2.** *See* 1 E. Kuntz, *A Treatise on the Law of Oil and Gas* §§ 4.3–4.7 (1962).

drainage would be more than 40 acres but less than 80 acres. And, he added, if production were attributed to "more than one zone, it even drains a smaller area yet." Thus he concluded that no matter how one looked at it, the existing well "simply will not drain 80 acres based on volumetric calculations."

In contrast to the scientifically supported basis for Mr. Newville's conclusions were the unsupported opinions and factually misleading testimony of Union Texas' expert, Greg McDonald. For example, he cited low production from wells existing in the sections surrounding Section 11, where the Haymaker No. 1 is located. What he failed to mention was that many of the wells he testified about did not produce from the Oswego/Big Lime and those that did were completed in those formations as increased density wells only after failing to locate a productive Misener, Hunton or Wilcox formation. With regard to his opinion concerning recovery of 15,000 barrels, the Union Texas expert did not mention making any foundational study or otherwise refer to any underlying factual data to support his estimate. All he said was, "I disagree with the previous testimony as to 5,000.... It would roughly come up to about 15,000 in 10 years.... I'm not going to say it will recover all of them, but recover most."

To support his opinion regarding economic feasibility of a second well, Mr. Newville presented data resulting from extensive studies of production levels, product values and yield-related income, both gross and net, which he referred to as "economic runs" computed to achieve various return-on-investment figures. This data, along with evidence regarding volumetric calculations, drainage and untapped reserves, formed the foundation for Mr. Newville's conclusion that production from a second well "would be 35,000 barrels of oil and 100 million cubic feet of gas. Which ... would yield about a 2.2 return on the investment."

Again the only challenge made to this was an unsupported conclusory opinion offered by Mr. McDonald during cross-examination when he said Union Texas would not drill for "anything less than 30,000", and added, "[I]n my opinion, that second well will not make 30,000 based on the history of the area", evidently referring to the area production we discussed earlier. Also on cross-examination, Mr. McDonald declined to specify the economic "guidelines" for his conclusion except to finally say, "[I]t's the same economics Mr. Newville used."

Proper appraisal of the expert testimony requires observance of the following benchmark principle approved in *Downs v. Longfellow Corp.*, 351 P.2d 999 (Okl.1960):

> "The reasons given in support of the opinions [of an expert witness] rather than the abstract opinions are of importance, and the opinion is of no greater value than the reasons given in its support. If no rational basis for the opinion appears, or if the facts from which the opinion was derived do not justify it, the opinion is of no probative force, and it does not constitute evidence sufficient to ... sustain a finding or verdict."

It appears this fundamental criterion was applied by the trial examiner and referee, but ignored by the Commissioners.

■ We turn now to the findings of the Commission. Among others, it found that an additional well in the Haymaker unit would not be economically feasible and would be wasteful. The foregoing review demonstrates that this "finding" is not supported by relevant, substantial, or credible evidence, and certainly none that induces conviction. On the contrary, substantial evidence suggests that waste will occur if a second well is *not* drilled in that otherwise recoverable oil will be left in the ground and never recovered.

With regard to the Commission's conclusion that a second well would "upset" the correlative rights "of others," there is no evidence, direct or circumstantial, of any adverse interaction among area owners or that the rights of any other mineral owner would be offended by granting the application. Indeed, the only correlative right involved is Haymakers' right to capture all their oil and it will be adversely affected if the application is not granted.

Finally, we mention one other erroneous finding of the Commission, namely that "[a]pplicants had no present intention to drill." The evidence is to the contrary. The only reference to the subject was a question put by a Commissioner to Haymakers' lawyer: "Does your client wish to drill the well?" he was asked. "No," he replied, "we have other parties that will drill it." Just exactly what relevance the subject has to the operative facts of the matter is not clear but the Commission's question was likely prompted by another unproved Union Texas allegation—that "the main purpose of this application is to give the Haymakers a basis for a lawsuit.... [t]hey want the Commission to say yes, another well can be drilled on that tract and then they can come at us for not fully developing it."

### III

The order appealed is vacated and the cause is remanded to the Commission for further proceedings not inconsistent with the views expressed in this opinion.

MEANS and REIF, JJ., concur.